**BROWN & WILLIAMSON TOBACCO CORPORATION,**
Plaintiff-Appellee—Cross-Appellant,

v.

**Walter JACOBSON and CBS, Inc.,**
Defendants-Appellants—Cross-Appellees.

Nos. 86–2474, 86–2475.

United States Court of Appeals,
Seventh Circuit.

Argued April 3, 1987.

Decided Aug. 12, 1987.

Rehearing and Rehearing En Banc
Denied Nov. 16, 1987.

Martin London, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants-appellants/cross-appellees.

P. Cameron DeVore, Davis, Wright & Jones, Seattle, Wash., for plaintiff-appellee/cross-appellant.

Before BAUER, Chief Judge, WOOD and POSNER, Circuit Judges.

BAUER, Chief Judge.

This case is the sequel to *Brown & Williamson v. Jacobson*, 713 F.2d 262 (7th Cir.1983), in which we reinstated a libel suit that had been brought by Brown & Williamson Tobacco Corporation, which produces and markets Viceroy cigarettes, against CBS, Inc. Following our remand, the district court held a jury trial that resulted in a verdict against CBS and an award of $3,000,000 in compensatory damages and an award of $2,050,000 in punitive damages. Following post-trial motions, the district court reduced the compensatory

damage award to $1.00 but upheld the punitive damage award. *See Brown & Williamson v. Jacobson*, 644 F.Supp. 1240 (N.D.Ill.1986). We affirm the district court's decision on liability and punitive damages but reverse its compensatory damage ruling and reinstate $1,000,000 of the $3,000,000 originally awarded by the jury.

## I.

The attitude of most knowledgeable and disinterested persons toward the tobacco industry is certainly negative; at least it has been negative for the past decade. In such an atmosphere, it becomes difficult to imagine how the tobacco people can be libeled. The bashing of the industry by government and private groups has become a virtual cottage industry. This case, however, demonstrates that general bum raps against the whole tobacco industry are different from specific accusations of skulduggery by a specific company or person. And this case involves some very specific statements against a very specific company in the tobacco industry. The facts are as follows: Walter Jacobson, an employee of the CBS-owned Chicago television station WBBM–TV, has served for a number of years as the co-anchor for the 10 p.m. weekday newscasts.[1] In addition to fulfilling his duties as an anchorman, Jacobson also delivers a nightly feature known as "Walter Jacobson's Perspective." When Jacobson delivers his Perspectives, he moves from his normal location at the anchor desk, which is located in the station's newsroom rather than in a separate studio, to a special "Perspective" section of the newsroom. During the feature, the word Perspective appears on the screen with Mr. Jacobson's signature below it. The Perspective segments are rebroadcast the following day during WBBM's early evening news broadcasts.

As part of its activities promoting the quality of its news personalities, CBS ran ads which stated that "[w]ith ten years of experience on our anchor desk, [Walter Jacobson] has established himself as the city's most savvy political reporter ... with contacts as solid as his credentials." Jacobson was touted by CBS as someone who "pulls no punches" and "lays it on the line." According to the ads, he is a journalist who will "make you angry. Or make you cheer. Walter Jacobson is liable to evoke all kinds of reactions ... and he'll always leave you informed." When he delivered his Perspective on November 11, 1981, he made the Brown & Williamson Tobacco Corporation very angry.

Jacobson's November 11 Perspective was the third in a series on the cigarette industry. The first in the series dealt with the political influence of tobacco manufacturers while the second in the series discussed the failure of cigarette manufacturers to incorporate fire prevention features into their products. The final segment in the series, which was promoted on the day of the broadcast as "[t]obacco industry hooks children ... Tonight at 10:00," dealt with the marketing practices of the cigarette industry. After Jacobson had moved to the Perspective section of the newsroom, his co-anchor, Harry Porterfield, introduced Jacobson's Perspective by stating:

For the past two nights in Perspective, Walter has been reporting on the companies that make cigarettes and the clout they carry in Washington.

Tonight he has the last in his series of special reports, a look at how the cigarette business gets its customers.

Jacobson then delivered his Perspective:

Ask the cigarette business how it gets its customers and you will be told over and over again, that it's hard these days to get customers; that the good old days are gone forever. The good old ads for cigarettes cannot be used anymore. Old St. Nick, for example, pushing Lucky Strikes because ... "Luckies are easy on my throat." The cigarette business can't count on that kind of an ad anymore. Or the doctors pushing Camels; more doctors smoke Camels than any other cigarette. The business can't count on an ad like that anymore, either.

Nor can it count anymore on television. Pushing cigarettes on television is prohibited. Television is off limits to ciga-

---

1. The 10 p.m. news follows prime time programming in the central time zone.

rettes. And so the business (the killer business) has gone to the ad business in New York for help; to the slicksters on Madison Avenue, with a billion dollars a year for bigger and better ways to sell cigarettes.

Go for the youth of America. Go get 'em, guys. Get some young women, give them some samples. Pass them out on the streets, for free, to the teenagers of America. Hook 'em while they're young. Make 'em start now. Just think how many cigarettes they'll be smoking when they grow up.

Or, here's another cigarette-slickster idea. The Merit report wants your opinion; a survey, they say, on current events. A $270,000 Merit wagon. Walk in, children, and let us know what you think about President Reagan. Get involved, children. Thank you, on behalf of Merit cigarettes. Or another cigarette-slickster idea. Go for the children through sports. You'll never guess who's likely to be a winner at the Winter Olympics. How about Rudd Pyles, from Colorado? But better than that, how about Benson & Hedges? At-a-way. The best possible way to addict the children to poison. There are more subtle ways, as well. A scene, for example, in Superman II. A bus crashing into a truck. Could be any truck, couldn't it? But, in a movie that's being seen by millions of children who love Superman, the bus crashes into a Marlboro truck.

Jacobson then reached the portion of his Perspective that the jury and the district court found libeled Brown & Williamson:

The cigarette business insists, in fact, it will swear up and down in public, it is not selling cigarettes to children; that if children are smoking (which they are, more than ever before), it's not the fault of the cigarette business. Who knows whose fault it is, says the cigarette business.

That's what Viceroy is saying. Who knows whose fault it is that children are smoking? It's not ours. Well, there is a confidential report on cigarette advertising in the files of the federal government right now, a Viceroy advertising [sic]. The Viceroy strategy for attracting young people (starters, they are called) to smoking.

"For the young smoker a cigarette falls into the same category with wine, beer, shaving, or wearing a bra," says the Viceroy strategy. "A declaration of independence and striving for self-identity. Therefore, an attempt should be made," says Viceroy, "to present the cigarette as an initiation into the adult world, to present the cigarette as an illicit pleasure, a basic symbol of the growing-up maturity process. An attempt should be made," says the Viceroy slicksters, "to relate the cigarette to pot, wine, beer, and sex. Do not communicate health or health-related points."

That's the strategy of the cigarette-slicksters, the cigarette business which is insisting in public ... we are not selling cigarettes to children.

They're not slicksters. They're liars.

While Jacobson was making his statements about Viceroy, superimposed on the screen was a current Viceroy ad featuring two packs of Viceroy Rich Lights, a golf ball, and a part of a golf club. The relation of that particular ad to "pot, wine, beer, and sex" advertisements is not clear. Jacobson testified that the golf club ad was used only as a means of identifying the brand name for the viewer.

The "confidential report in the files of the federal government" referred to by Jacobson was a report by members of the staff of the Federal Trade Commission (FTC). The report first came to the attention of Jacobson's researcher, Michael Radutzky, in the summer of 1981 when Radutzky saw an article in a Kentucky newspaper that referred to the FTC report. Radutzky, who went on to become the producer of the 5:00 p.m. and then the 10:00 p.m. news at WBBM–TV, received copies of the pertinent pages of the FTC report from the author of the newspaper article.

The FTC report stated that documents obtained from Brown & Williamson and one of its advertising agencies, Ted Bates & Company, "set forth the development of an advertising strategy for Viceroy cigarettes designed to suppress or minimize public concern about the health effects of smoking." The report stated that the doc-

uments showed that Bates, which had the Viceroy account in 1975, requested a marketing and research firm, Marketing and Research Counselors, Inc., (MARC) to assist Bates in developing a marketable image for Viceroy cigarettes. After conducting a number of focus group interviews on the subject of smoking, MARC delivered a report, which was authored by N. Kennan, to Bates. The MARC report made recommendations on what its author thought were the important elements of a successful cigarette advertising campaign. As summarized by the FTC report, "the basic premise of the [MARC] report's recommendations is that since there 'are not any real, absolute, positive qualities and attributes in a cigarette,' the most effective advertising is designed to 'reduce objections' to the product by presenting a picture or situation ambiguous enough to provide smokers with a rationale for their behavior and a means of repressing their health concerns about smoking."

The MARC report discussed in a later chapter how "starters" could be introduced to the Viceroy brand. The FTC report quoted the MARC report's discussion of how the young smoker related to cigarettes. "For them," the MARC report opined, "a cigarette, and the whole smoking process, is part of the illicit pleasure category.... In the young smoker's mind a cigarette falls into the same category with wine, beer, shaving, wearing a bra (or *purposely* not wearing one), declaration of independence and striving for self-identity. For the young starter, a cigarette is associated with introduction to sex life, with courtship, with smoking 'pot' and keeping late studying hours." FTC report at 17 (quoting MARC report) (emphasis in MARC report). The MARC report went on to suggest a strategy for attracting "starters" to the Viceroy brand based "on the following major parameters":

> Present the cigarette as one of a few initiations into the adult world.
> Present the cigarette as part of the illicit pleasure category of products and activities.
> In your ads create a situation taken from the day-to-day life of the young smoker but in an elegant manner have this situation touch on the basic symbols of the growing-up, maturity process.
> To the best of your ability, (considering some legal constraints), relate the cigarette to "pot," wine, beer, sex etc.
> *Don't* communicate health or health-related points.

FTC report at 18 (quoting MARC report). The FTC report then stated that Brown & Williamson had adopted many of the ideas contained in the MARC report in the development of an advertising campaign for Viceroy. Specifically, the report noted that in a document it had received directly from Brown & Williamson, rather than from an advertising agency or a firm hired by the advertising agency, Brown & Williamson had indicated that it must provide consumers with a rationalization for smoking and a "means of repressing their health concerns about smoking a full flavor Viceroy." FTC report at 18 (quoting Viceroy strategy paper dated March 3, 1976). The Viceroy strategy paper also indicated that other major full flavor brands had either consciously or unconsciously "coped" with the smoking and health issues in advertising by appealing to repression. The strategy paper suggested that Viceroy's advertising objective should be to "communicate effectively that Viceroy is a satisfying flavorful cigarette which young adult smokers enjoy, by providing them a rationalization for smoking, or, a repression of the health concern they appear to need." FTC report at 19 (citing Viceroy strategy paper).

The FTC report then cited three Viceroy advertising strategies that were used in a six-month media campaign conducted in three test cities in 1976. The first campaign was the "satisfaction" campaign which was intended to provide a "rationalization." Specifically, the intention was to convey the message that "Viceroy is so satisfying that smokers can smoke fewer cigarettes and still receive the satisfaction they want." The second campaign, the "tension release" campaign, was intended to convince the smoker that Viceroy's satisfying flavor would help the smoker in a tense situation. The third campaign, the "feels good" campaign, was intended to repress concerns that smokers might have

about smoking by justifying it with the simple slogan "if it feels good, do it; if it feels good, smoke it." FTC report at 20 (citing internal memorandum dated July 14, 1976). None of these campaigns was cited in the FTC report as an example of Viceroy implementing the MARC report strategy to relate the cigarette to "pot," wine, beer, and sex. The FTC report stated, however, that Brown & Williamson documents did indicate that the company had "translated the advice on how to attract young 'starters' into an advertising campaign featuring young adults in situations that the vast majority of young people probably would experience and in situations demonstrating adherence to a 'free and easy, hedonistic lifestyle.' " FTC report at 20 (citing document titled Viceroy Marketing/Advertising Strategy dated January 26, 1976).

After reviewing the report, Radutzky contacted members of the FTC staff who had drafted the report to confirm that the partial copy of the report he had received from the Kentucky newspaper was accurate. The staff members told Radutzky that they could not send him the confidential documents cited in the report but did confirm that the report and its findings were accurate.

Radutzky also spoke on at least two occasions with Brown & Williamson public relations officer Thomas Humber. At trial, CBS introduced two internal Viceroy documents, which were written by Humber for his superiors, that relate the substance of the conversations that Humber had with Radutzky. In a conversation on November 4, 1981, Humber stated that the internal Viceroy memoranda could only be understood in context. The context included the fact that the Ted Bates agency was told prior to their submission of the memo that it was in trouble on the Viceroy account because Brown & Williamson was unhappy with its work. Humber told Radutzky that Brown & Williamson had not requested any ad campaign similar to the one suggested by Bates. Moreover, he stated that Brown & Williamson had rejected the strategy embodied in the documents submitted by Bates. Humber also noted that "thus far [we] have been unable to find copies of the proposed ads, to the best of our knowledge,

no ads as described by the memo were ever actually published." Radutzky was also informed that partly as a result of Brown & Williamson's dissatisfaction with the specific proposal submitted by Bates, Brown & Williamson had terminated Bates' participation in Viceroy advertising. In a conversation with Radutzky on November 5, Humber told Radutzky that all Brown & Williamson ads must have the approval of the legal department and the highest levels of senior management. He also stated that the legal department did not get involved in the creative process and did not review the ads until they "are at the point of worked-up ads." Humber stated that the proposals referred to in the FTC report were similar to a proposed libelous story that a young inexperienced reporter might submit to his editors but that was corrected by a news organization's editors and attorneys. Humber stated that in such a case no legitimate criticism could be leveled at the news organization. He clearly implied that because Brown & Williamson had never run any of the controversial proposals as ads, it would be unfair to criticize Brown & Williamson simply because such proposals had been made by individuals who could not authorize an ad campaign.

In addition to contacting Brown & Williamson, Radutzky, on Jacobson's request, conducted a search for "pot," wine, beer and sex ads that were used by Viceroy. Unable to locate any such ads, Radutzky reported the result of his search to Jacobson. Radutzky also commented to Jacobson prior to the broadcast that Jacobson's script for the broadcast omitted Brown & Williamson's statement that it had never adopted a "pot," wine, beer or sex strategy. Jacobson did not alter his script.

During the course of his investigation, Radutzky made contemporaneous interview notes and extensive handwritten notes on his copy of the FTC report. In addition, he developed an eighteen-page sample script for the broadcast. The sample script, which was duplicated at least six times and distributed to various people in the newsroom including Walter Jacobson, reported "both sides of the issue." The jury never saw much of Radutzky's work product.

Prior to trial, Radutzky destroyed all of his contemporaneous interview notes, five of the ten pages of the FTC report including those pages that contained the recommendations from the MARC report, and fifteen of the original eighteen pages of his sample script. CBS was unable to produce any of the copies of the sample script that Radutzky had distributed in the newsroom.

Radutzky testified that he destroyed his materials as part of a general housecleaning after the original complaint in this case had been dismissed by the district court but before he became aware that Brown & Williamson appealed that dismissal. His destruction of the documents contravened a CBS retention policy that provides that once litigation has commenced "any and all related materials should be retained until specifically released." The policy also provides that "[o]bviously if there is a ... pending legal action, our policy is to retain all pertinent materials unless specifically released by the Law Department." Although Radutzky conceded that he did destroy the documents without the approval of the Law Department at CBS, he stated that he was unaware that the policy existed.

When Radutzky destroyed the documents, he was no longer assigned to the Perspective unit and therefore his desk was in a completely different section of the newsroom. Nonetheless, he apparently made a point of "cleaning house" in the Perspective section of the newsroom even though he had not worked there for several months.

Brown & Williamson attempted to prove that Jacobson's charges were false by introducing every Viceroy advertisement published between 1975 and 1982. They argued to the jury that none of these advertisements was a "pot," wine, beer, or sex ad. In addition, Robert Pittman, the Brown & Williamson Vice President whose approval was required before any Viceroy ad could be published, testified that he had never seen the MARC report prior to the litigation in this case. Pittman also stated that Brown & Williamson had never asked Bates to design any "pot," wine, beer, and sex ads. William Scholz, the Bates employee in charge of the Viceroy account, confirmed that Brown & Williamson had never asked Bates to utilize a "pot," wine, beer, and sex strategy in developing advertisements.

Brown & Williamson put forth evidence that it adhered vigorously to the Cigarette Advertising Code, which bars advertising to persons under 21. In addition to adhering to the Code, Brown & Williamson took the additional step of establishing a detailed procedure to ensure that its advertising agencies did not use models who either were or appeared to be younger than 25. When undertaking advertising campaigns that involved the distribution of samples, Brown & Williamson required the individuals distributing the samples to sign statements promising not to distribute cigarettes to people under 21.

Walter Jacobson also testified at trial. Jacobson indicated that he had read the FTC report prior to delivering his Perspective and was aware that the FTC report was quoting a document prepared by Market and Research Counselors. He agreed that the way in which the Perspective was delivered, with the Viceroy graphics on the screen at the time he was referring to the "pot," wine, beer, and sex strategy, would convey the impression that the "pot," wine, beer, and sex comment was made by Viceroy itself rather than MARC. After agreeing that such an impression would be created, Jacobson added that "I even said that, 'Viceroy says.'"

Jacobson's testimony indicated that he had reviewed Radutzky's sample script prior to delivering the Perspective. Jacobson corroborated part of Radutzky's testimony by confirming that Radutzky had told him that he had been unable to find any ads showing that Brown & Williamson had implemented a "pot," wine, beer, and sex advertising strategy. Jacobson was also aware that Radutzky had spoken with Brown & Williamson and that the company denied adopting the strategy and therefore had no advertisements that they could supply that would reflect that strategy. According to Jacobson, he paraphrased Viceroy's denial in the broadcast when he stat-

ed "Viceroy insists ... whose fault is it that children are smoking? It's not ours."

Jacobson also agreed, at least at one point, that it would be fair to say that when he wrote the Perspective script he wrote it in the present tense with respect to Viceroy and the purported "pot," wine, beer, and sex strategy. For example, he agreed that when he used a phrase such as "[t]hat's what Viceroy is saying," he realized that it would be interpreted by any reasonable listener as referring to the present tense. At other points during his testimony, however, Jacobson appeared to state that some language used during the broadcast was past tense. While recognizing that there was no indication in the Perspective that the strategy mentioned in the MARC report had been recommended in 1975, six years before the broadcast, Jacobson testified that because the FTC report described it as "the Viceroy strategy" he did not believe that he gave the viewer "an impression of time that varies from the facts." Under further questioning, Jacobson did agree that the phrase "[a]n attempt should be made, says the Viceroy slicksters to relate the cigarette to 'pot,' wine, and beer" would be "more current" than the phrase "the Viceroy strategy."[2]

Jacobson also noted that there was a distinction between a report, an analysis, a commentary and an editorial. An example of a report, according to Jacobson, would be if a newsperson went on the air and said "[t]he FTC says that Viceroy did such and such, and Viceroy says it did not." He agreed that when delivering such a statement a reporter should try to be fair and accurate. Jacobson also stated that "[m]y life is research" and indicated that what he said in the Perspective was "absolutely true."

On direct examination, Jacobson's counsel brought out his client's state of mind at the time of the broadcast. Jacobson asserted that he "believed" at the time he delivered the Perspective that it was truthful and that it was a fair and accurate summary of what the Federal Trade Commission had said about Viceroy cigarettes.

Jacobson also testified about what he "intend[ed]" to inform the viewers about Viceroy when he "sat down to write" the Perspective. When cross examined, Jacobson confirmed that he had testified on direct examination about what he was thinking when he wrote the script and attempted to refute the allegation that he "really [had] no recollection at all of what [he] thought about in" preparing the script by stating that such an assertion was "absolutely untrue." Brown & Williamson's counsel then read Jacobson's 1984 deposition in which the following exchange took place:

Question: I just want to know if you have a recollection whether in 1981, when you called the manufacturers of Viceroy cigarettes liars, you were attempting then to be objective?

Jacobson: I don't remember what I was thinking now when I wrote that three and a half years ago.

Question: Can you recall whether when you wrote the November 11, 1981 script, you were trying to fairly present both sides of the question?

Jacobson: I don't remember what I was thinking when I wrote that script. It's hard to remember three and a half years ago.

Question: You don't remember what was in your mind?

Jacobson: Right.

Question: You do remember you wrote the script though?

Jacobson: I don't remember writing it. I do see it.

Question: You don't remember writing it?

Jacobson: Yes, I mean—I don't remember sitting at my typewriter, what I was thinking and how my hands were working. I see the script. It has a date. I wrote it, obviously, and I remember being involved in a series of reports on that subject.

On redirect examination, Jacobson asserted that his recollection of his state of mind at the time of the broadcast had improved

---

**2.** Jacobson also agreed that when he said "Viceroy slicksters" he was talking about Brown & Williamson and the people who make Viceroy cigarettes as opposed to their advertising agency.

from the time of his deposition to the time of the trial because he had "gone over everything that ha[d] been given to [him] by a whole team of lawyers" including the script that he used during his Perspective and the videotape of the actual broadcast. Jacobson stated that as a consequence his memory was jarred and he was able to "just recall more specifically some things that I didn't recall from before."

## II.

■ Concerned that traditional state law actions for defamation might interfere with the First Amendment guarantees of free expression, the Supreme Court held in the landmark case of *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), that a public official could recover in a libel action only if the official was able to show that the alleged defamatory statement was made with " 'actual malice'—that is with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80, 84 S.Ct. at 726. This constitutional standard, which was extended to public figures such as Brown & Williamson in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), requires that the plaintiff prove by "clear and convincing evidence" that the defendant either knew the statement was false or "in fact entertained serious doubts as to [its] truth...." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968).

In *New York Times*, the Supreme Court also outlined the role that a reviewing court must play in insuring that the First Amendment is not infringed upon. In reviewing a defamation verdict, courts must exercise particularly careful review. They "must 'make an independent examination of the whole record,' ... so as to assure [themselves] that the judgment does not constitute a forbidden intrusion on the field of free expression." *New York Times*, 376 U.S. at 285, 84 S.Ct. at 729 (quoting *Edwards v. South Carolina*, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963)); *see also Tavoulareas v. Piro*, 817 F.2d 762, 776–78 (D.C.Cir.1987) (en banc). In *Bose v. Consumers Union*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), the Court re-

affirmed the *New York Times* mandate of independent appellate review that it had applied "uncounted times before." *Id.* at 514, 104 S.Ct. at 1967. The Court stated that "[t]he question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact." *Id.* at 511, 104 S.Ct. at 1965. The Court held that appellate judges "must exercise independent judgment and determine whether the record establishes actual malice with convincing clarity." *Id.* Jacobson and CBS argue that *Bose* mandates independent appellate review of all issues of "constitutional fact," *see Bose*, 466 U.S. at 508 n. 27, 104 S.Ct. at 1964 n. 27, which they contend includes the issues of falsity and opinion. Brown & Williamson counters that *Bose* allows expanded appellate review "solely of the issue of actual malice, and of no other question." Appellee's Brief at 7 (citing *Bose*, 466 U.S. at 514 n. 31, 104 S.Ct. at 1967 n. 31). There is also a dispute about what independent appellate review means. The District of Columbia Circuit in *Tavoulareas v. Piro*, 817 F.2d 762 (D.C.Cir.1987), recently summarized the two positions. "Under one view, *Bose*'s mandate of *de novo* review means precisely that, with no deference at all to be accorded any jury finding germane to actual malice. Under the contrary view, *Bose* does not alter the traditional rules governing the review of jury verdicts and thus judicial deference is constitutionally mandated to presumed jury findings of underlying facts, evaluations of credibility, and the drawing of inferences." At 776–77.

The extent to which *Bose* mandates independent appellate review "as to findings of underlying facts, evaluations of credibility, and the drawing of inferences" is still an open question. *See Tavoulareas*, at 777 (declining to decide the issue). *But see Tavoulareas*, at 806 (Wald, C.J., concurring in judgment) (arguing that *Tavoulareas* majority does "reexamine and reject 'permissible' inferences which the jury might have drawn to support their verdict"). We decline to "tackle the knotty constitutional

issue regarding what constitutes independent review under *Bose....*" *Tavoulareas*, at 777. We also decline to decide whether Brown & Williamson is correct in arguing that *Bose*'s mandate of independent appellate review encompasses only the issue of actual malice.

We can avoid these issues by accepting, for purposes of this case only, the defendants' argument that *Bose* mandates a wide-ranging appellate review, with little or no deference to the jury's findings, of all aspects of this case including falsity and opinion. We emphasize that we are not deciding the correctness of the defendants' interpretation of *Bose*. Rather, we are applying their interpretation because we can avoid the difficult issues left unresolved by *Bose* without affecting the outcome of this case because both deferential and *de novo* review yield the same result.

Of course, even under defendants' interpretation of *Bose*, there is a limit to the amount of independent review that an appellate court can engage in. For example, we are incapable of making complete credibility determinations because we are unable to observe the demeanor of witnesses. We can, however, review the transcript of a witness's testimony and determine whether the record would give us any reason to question the jury's credibility findings. When the record fully supports the jury's determinations, as in this case, *Bose* obviously requires the appellate court to affirm the decision below. In short, we do not believe, nor do defendants argue, that *Bose* requires an appellate court to believe the unbelievable and to accept the untenable. At most, *Bose* requires an appellate court to review all the findings below, to the extent that it can within the confines of an appellate record, and determine whether the judgment below is correct. In our discussion, we will undertake a thorough review of all aspects of this case including opinion, falsity, fair summary, and actual malice and determine whether the evidence supports the jury verdict.

### III.

CBS and Jacobson raise three main liability defenses. First, they contend that the broadcast was an expression of editorial opinion protected by the First Amendment. Second, they argue that the statements of fact that were in the broadcast, including the summary of the FTC report, were substantially true. Finally, they assert that Brown & Williamson did not meet its burden of proving actual malice.

#### A. *Opinion*

■ Both parties ask us to apply a test used by the District of Columbia Circuit, *see Ollman v. Evans*, 750 F.2d 970 (D.C. Cir.1984) (en banc) (plurality opinion of Starr, J.), *cert. denied*, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985), in deciding whether Jacobson's Perspective was opinion protected from a defamation suit by the First Amendment.[3] Under the test, a court must first analyze whether the statement has "a precise core of meaning for which a consensus of understanding exists or, conversely, whether the statement is indefinite and ambiguous." 750 F.2d at 979. Second, a court must consider whether the statement is capable of being objectively characterized as true or false. Third, a court should review the full context of the statement because the language surrounding an alleged defamatory statement may influence "the average reader's readiness to infer that a particular statement has factual content." *Id.* Fourth, in addition to considering the immediate context in which a statement is made, a court should also consider the broader social context into which the statement fits. *Id.* at 983.

In support of their argument that the literary and social context in which the Perspective was made requires this court to conclude that the Perspective was opinion protected by the First Amendment, defendants note that Jacobson delivered his Perspective away from the anchor desk

---

**3.** Although we are using the test embodied in Judge Starr's opinion, we do so only at the request of the parties. Because the parties agree on the *Ollman* test, we need not decide whether that test is the appropriate one to assist a court in differentiating fact from opinion. *See generally McCabe v. Rattiner*, 814 F.2d 839 (1st Cir.1987).

with the word "Perspective" written on the screen near Jacobson's signature. They also argue that because the Perspective was delivered in a vehement and caustic manner and the phrase "the killer business" was used near the beginning of the Perspective, viewers should have been alerted to Jacobson's harsh opinion of the techniques of cigarette advertisers. They cite as an example Jacobson's statement that the cigarette "slicksters ... are not slicksters, they're liars." In addition, defendants argue that the use of phrases such as "slicksters," "the killer business," "hook 'em while they're young," "addicting the children to poison," and "they're liars," show that the broadcast when considered in context is really protected opinion. CBS's opinion argument appears to be best summarized by their contention that "[t]he tone of the broadcast should have immunized CBS and Mr. Jacobson from liability—not exposed them to it." Appellant's Brief at 34.

In making its "context is determinative" argument, CBS ignores some important facts. First, Jacobson's co-anchor began his introduction for the Perspective by stating that "Walter has been *reporting* [for the past two nights] on the companies that make cigarettes and the clout they carry in Washington." (Emphasis added.) In completing the introduction, Jacobson's co-anchor stated that "[t]onight he has the last in his series of special reports, a look at how the cigarette business gets its customers." The Perspective was also promoted during the day of the broadcast as "[t]obacco industry hooks children ... Tonight at 10:00." The introduction itself and the promotional advertisements would appear to lead reasonable viewers to believe that what they were about to hear was a news report by Walter Jacobson. In addition, the literary context in which the statement was made also provides no assistance to CBS. CBS concedes, as it must, that the entire Perspective was filled with specific examples of cigarette marketing techniques that would attract young people.

Rather than preparing the viewer for Jacobson's opinion about Viceroy, the literary context prepared the viewer for an example of how Viceroy went about attracting young smokers. An example (whether true or not) is exactly what Jacobson provided.

The defendants appear to realize that the literary and social context does not automatically immunize the entire broadcast as opinion because they concede that "not ... every statement in the broadcast is automatically immune from factual analysis." Appellant's Brief at 37 n. 14. Despite this concession, the defendants have failed, with one minor exception, to argue to this court what specific statements constitute protected opinion.[4] The defendants probably prefer to avoid specifics because even a cursory analysis of the relevant parts of the broadcast using the first two factors in the *Ollman* analysis ("core meaning" and the extent to which a statement can be characterized as true or false) reveals that the statements are factual. "The cigarette business insists ... it is not selling cigarettes to children.... That's what Viceroy is saying. Who knows whose fault it is [that children are smoking more]? It's not ours." There is an obvious "core meaning," *see Ollman,* 750 F.2d at 979, to this statement (Viceroy says it is not selling cigarettes to children) that is either true or false. It is not an indefinite or ambiguous statement. *Id.* Jacobson also says that "[w]ell, there is a confidential report on cigarette advertising in the files of the federal government right now, a Viceroy advertising [sic]. The Viceroy strategy for attracting young people (starters, they are called) to smoking." The Perspective then states what the "Viceroy strategy says" and what "the Viceroy slicksters say." The critical passages of the Perspective are without question factual under the first two *Ollman* factors. The only issue is whether the quoted statement is true or false.

We note that in holding that the broadcast is fact and not opinion, we simply

---

**4.** The only relevant part of the broadcast that the defendants contend is opinion is Jacobson's closing statement that "they're liars." As Brown & Williamson points out, even assuming that "they're liars" can be characterized as opinion, it does not make the various other allegations against Brown & Williamson any less factual.

agree with the view that Jacobson expressed at trial. Jacobson, in attempting to draw a distinction between a report, an analysis, a commentary, and an editorial, stated that a report would be if a reporter went on the air and said "[t]he FTC says that Viceroy did such and such, and Viceroy says it did not." Jacobson's example of a report is, of course, essentially what he delivered to his viewers on November 11, 1981. The fact that a report is delivered in a caustic tone does not turn a statement of fact into a statement of opinion.

Our holding on this issue is also supported by the statements of Jacobson's trial counsel. In closing argument, it was asserted that the statements Jacobson made (as interpreted by Jacobson and CBS) were "absolutely, totally, 100% true." While an opinion can be right or wrong, it cannot be true or false. Jacobson's trial counsel recognized this and so do we.

### B. *Falsity*

In their closing argument at trial, CBS argued at three separate points that "when you look at the Perspective closely you will see that there is no statement whatsoever about any advertising being run, and the suggestion made [by Brown & Williamson] that advertising is being run ... is only an attempt to take your eye off the ball of what the real issue in this case is." CBS also stated that Jacobson "never in his Perspective said anything about running pot, wine, beer and sex advertisements." It reiterated this point later in its closing argument: "[a]gain, I ask you: Is there a word? Is there a single word that says that Viceroy ever ran an ad featuring pot, wine, sex and beer?" The defendants answered the question themselves: "Of course there is no such statement. And it's ridiculous to suggest that they ever did run such a campaign."

▮ It may be ridiculous to suggest that such a campaign was run but this is exactly what CBS now argues before this court. We reject CBS's argument not only because CBS waived it but also because it is not convincing. CBS contends that three advertisements, which were run as part of a six month test market campaign in three cities, were the implementation of the "pot," wine, beer, and sex strategy recommended in the MARC report. These advertisements, according to CBS, were the "more refined and acceptable expression of the MARC strategy" to present the cigarette as part of the illicit pleasure category of products and activities. Responsive Brief at 2. The ads, as described by CBS, show "a well-dressed young woman wading in a public fountain while her date looks on, a young man poised to throw a cream pie at the camera, and a young woman dousing her head under a water pump." At the top of the ads is the slogan "If it feels good, do it. If it feels good, smoke it." According to CBS, the first sentence is "a common slogan of the sexual revolution" while the second sentence is "a thinly-veiled reference to marijuana." At the bottom of each advertisement is a picture of a package of Viceroy cigarettes. Under the package is the slogan "Viceroy. It feels good."

We agree with trial counsel that these ads cannot be fairly characterized as "refined" versions of "pot," wine, beer, and sex ads. In the fountain ad, the woman is fully clothed in a dress and a shirt jacket. The water in the fountain is coming up to her knees and her dress appears to be about five inches above her knee on the right leg and eleven inches above the knee on her left leg, which is extended forward. The man in the ad is fully clothed and about ten feet away from the woman. She appears from the picture to be having a good time even though she is not involved in any sexual adventure. The ad seems to imply that this is a woman who has done something (wade in the fountain) because "it feels good." The ad also implies that this woman, who is holding a cigarette in her hand, is smoking that cigarette because it feels good. ("If it feels good, smoke it.") The connection to Viceroy is at the bottom of the ad where it states "Viceroy. It feels good." As we read the ad in context, the full message is that an individual should do things that feel good and that because Viceroy (not marijuana) feels good when one smokes it, the American consumer should choose Viceroy. The other two ads convey essentially the same message. The age range of the models in the advertise-

ments appears to be from the mid to late twenties to the mid thirties. We conclude that these ads are not, even in somewhat refined form, "pot," wine, beer, and sex ads.

It is true that the phrase "if it feels good, do it" can under certain circumstances have sexual connotations. When the ads are read in context, however, there is only an attempt to relate pleasurable experiences (which could include sex but in the ads do not) to smoking Viceroys. Our reading of these ads is also supported by the FTC report which cited these ads as an attempt by Brown & Williamson to implement a strategy that attempted to provide consumers "with a rationale for smoking a full flavor Viceroy...." These ads were not cited by the FTC as an attempt by Viceroy to attract "starters" or to implement the "pot," wine, beer, and sex strategy that had been proposed by MARC. Moreover, even if these ads could be characterized as sex ads, CBS has failed to show the truthfulness of the "pot," wine, and beer allegation.

■ In a related challenge, CBS argues that the district court erred in excluding a document referred to at trial as the final MARC report. The final MARC report was submitted by MARC to Bates in May 1976. The final MARC report is not the May 1975 "pot," wine, beer, and sex MARC report authored by N. Kennan. The final MARC report, which was not referred to in the FTC report, is a 243 page document that gives the details of testing of several "comp" ads, which are artists' renderings of possible advertising approaches. Two primary reasons support the district court's decision not to allow the final MARC report to be published to the jury. First, there was no showing that the content of the final report could be fairly attributed to Brown & Williamson since it had been written by MARC. Therefore, some of the contents of the report which the defendants argue contain some sexual themes

might be unfairly attributed by the jury to Brown & Williamson rather than MARC. Second, although there were similarities between some of the composite ads and the test market campaign actually run by Viceroy, the published ads themselves, and not the composite ads, were the only probative and nonprejudicial material that could be fairly attributed to Brown & Williamson.

CBS argues in this court that by excluding the final MARC report, the district court excluded "*the* critical evidence" of truth. The defendants contend that by seeing the final report, the jury would have understood that Brown & Williamson did implement the "pot," wine, beer, and sex strategy in an advertising campaign. The defendants point to the fountain ad as an example. In the final report, there was an ad similar to the fountain ad described above but with the slogan "If you don't have a hang-up about pleasure." In addition to changing the slogan before the ad was test marketed, Brown & Williamson also changed the ad, according to the defendants, "slightly to diminish its more overt sexual connotations." If the ads were truly similar to the ones used in the campaign, the defendants should have argued to the jury that the published ads, which were admitted into evidence, were indeed "pot," wine, beer, and sex ads. The defendants would not have needed the composite ads to make this argument. Of course, CBS and Jacobson declined to make such an argument apparently because they believed, as do we, that such an argument would have failed. Moreover, as the FTC report made clear, the fountain ad was not used to implement the "pot," wine, beer, and sex strategy for "starters" but was used to provide all consumers a rationale for smoking a full-flavor Viceroy. We conclude that the district court did not abuse its discretion in excluding the final MARC report.[5]

■ CBS and Jacobson also argue that the Perspective was a fair summary of the

---

5. The defendants also challenge Judge Hart's decision to exclude evidence of Brown & Williamson's advertising efforts for the other brands of cigarettes that it markets. Judge Hart also limited Brown & Williamson to introducing evidence directly concerning practices that ap-

plied to Viceroy. This was a reasonable limitation in a libel trial that dealt with charges that were made specifically against the Viceroy brand. Judge Hart acted well within his discretion.

FTC report. In *Brown & Williamson v. Jacobson*, 713 F.2d 262 (7th Cir.1983) (*Brown & Williamson I*), we had to decide whether the fairness of Jacobson's summary of the FTC report "emerges so incontrovertibly from a comparison of the [FTC report] with the broadcast that no rational jury" could conclude that Jacobson had distorted the report. *Id.* at 271 (holding that under Illinois law fair summary was a question of fact for the jury to decide). We remanded the case for trial, holding that a rational jury could find that Jacobson's broadcast was not a fair summary of the FTC report. In remanding for trial, we stated that the FTC report could be interpreted to convey the "following message: six years ago a market-research firm submitted to Brown & Williamson a set of rather lurid proposals for enticing young people to smoke cigarettes and Brown & Williamson adopted many of its ideas (though not necessarily the specific proposals quoted in the report) in an advertising campaign aimed at young smokers which it conducted the following year." *Id.* We held that a jury could find that Jacobson's Perspective carried a greater sting, and therefore was not a fair summary, if it concluded that Jacobson conveyed "the following message: Brown & Williamson currently is advertising cigarettes in a manner designed to entice children to smoke by associating smoking with drinking, sex, marijuana, and other illicit pleasures of youth." *Id.* In answer to a special interrogatory, the jury found that Jacobson's broadcast was not a fair summary of the FTC report.

The jury's finding normally would be the end of the matter. However, subsequent to our decision in *Brown & Williamson I*, the Supreme Court decided *Bose*. Because we have accepted for purposes of this case (and only this case) the defendants' contention that *Bose* mandates appellate review with no deference to the jury's findings, we will independently review the fair summary issue. The defendants contend that our conclusion on the fair summary issue should differ from *Brown & Williamson I*

because trial testimony supports their position on the fair summary issue. We do not agree. The trial record simply reinforces the result we hinted at in *Brown & Williamson I*. At trial, Jacobson stated that the Perspective attributed the "pot," wine, beer, and sex language to Viceroy rather than to the MARC report—"I even said that, 'Viceroy says.'" Jacobson also agreed that the language in the broadcast would lead viewers to believe that Jacobson was "making a present tense statement about current Viceroy strategy." These concessions simply reinforce the conclusion we hinted at in *Brown & Williamson I* and the one that Judge Hart reached in his opinion. Judge Hart correctly pointed out that "there are several differences between the FTC report and the broadcast that would allow a jury to find that the one was not a fair summary of the other." Judge Hart gave four examples:

1. The broadcast used the present tense to represent that the tactics were currently being used while the FTC staff report indicated that the quoted language came from a report written six years earlier.

2. The broadcast implied that the quotations from the MARC report came directly from [Brown & Williamson] while the FTC staff report clearly indicated that they were from the MARC report ...

3. The broadcast used the term "children" to refer to the object of this strategy, while the report used the terms "young smokers" and "starters."

4. The report did not cite any published Viceroy advertisement that implemented a pot, wine, beer or sex strategy to attract children to smoke cigarettes. The broadcast clearly implied such ads existed.

644 F.Supp. at 1253–54. We agree with Judge Hart's observations. The defendants have given us no reason to disagree with the jury's conclusion that the Perspective was not a fair summary of the FTC report. *See also Brown & Williamson I,* 713 F.2d at 271.[6]

---

**6.** Defendants also claim that this case is controlled by the Illinois rule of innocent construction. *See Fried v. Jacobson,* 99 Ill.2d 24, 75

Ill.Dec. 398, 457 N.E.2d 392 (1983); *Chapski v. Copley Press,* 92 Ill.2d 344, 65 Ill.Dec. 884, 442 N.E.2d 195 (1982). Under that rule, if the de-

### C. *Malice*

Even according no deference to the jury's findings, we conclude that Brown & Williamson proved by clear and convincing evidence that the defendants either knew the Perspective was false or in fact entertained serious doubts as to its truth. *See St. Amant v. Thompson*, 390 U.S. at 731, 88 S.Ct. at 1325; *see also New York Times v. Sullivan*, 376 U.S. at 279–80, 84 S.Ct. at 725–26.

The most compelling evidence of actual malice submitted to the jury was the intentional destruction of critical documents by Jacobson's researcher, Michael Radutzky. The story that emerges from Radutzky's testimony is that at some point after this litigation commenced in early 1982, he destroyed various documents that in all likelihood would have established that both he and Jacobson were aware that the "tobacco industry hooks children" Perspective was false at the time that it was delivered. The documents that Radutzky destroyed included: an eighteen-page sample script which was distributed to Jacobson and others in the newsroom, Radutzky's annotated copy of the FTC report, and various contemporaneous interview notes that Radutzky had taken while investigating the Perspective. Radutzky, however, did not destroy all of these documents. Radutzky only destroyed the parts of the documents that would have been relevant to this litigation. Radutzky destroyed fifteen of the eighteen pages of his copy of the sample script. Although there is no evidence that Radutzky destroyed the additional six or seven copies of the sample script that had been distributed to various individuals in the newsroom, CBS was unable to produce any of the copies of the sample script. Radutzky testified that he also went to Jacobson's desk (when he was no longer a member of the Perspective work unit) and disposed of some documents from Jacobson's desk that might have included the sample script. Radutzky also destroyed five of the ten pages

from his copy of the FTC report. As "luck" would have it, the five destroyed pages were the pages that contained the quotations of the "pot," wine, beer, and sex recommendations from the MARC report.

■ Radutzky's sample script, which Radutzky admitted reported both sides of the story, was reviewed by Jacobson before he prepared the final draft of the Perspective. Radutzky's selective destruction of this document, along with all the other document destruction that he undertook, is strong evidence of actual malice. A court and a jury are entitled to presume that documents destroyed in bad faith while litigation is pending would be unfavorable to the party that has destroyed the documents. *See Coates v. Johnson & Johnson*, 756 F.2d 524, 551 (7th Cir.1985); *S.C. Johnson & Son v. Louisville & Nashville Railroad*, 695 F.2d 253, 258–59 (7th Cir. 1982); *see also Nation-Wide Check v. Forest Hills Distributors*, 692 F.2d 214, 217–19 (1st Cir.1982).

■ Because Radutzky did have an "innocent" explanation for his activities, we must also consider whether the evidence indicates that Radutzky destroyed the documents in bad faith. We conclude that even a cursory review of his story reveals that the jury was justified in finding that it was a complete fabrication. Radutzky told the jury that he destroyed the documents while he was cleaning out his section of the newsroom. Radutzky also told the jury that he cleaned up Jacobson's desk in the Perspective section of the newsroom where Radutzky was no longer assigned. Radutzky testified that he decided to do the housecleaning after he heard that the libel case had been dismissed by the district court but before he heard that the dismissal would be appealed. As the district court pointed out, his emphasis on destroying the documents after the case had been dismissed confirms that Radutzky was aware of the common-sense notion that important documents should not be destroyed while litigation is pending.[7]

---

fendants are able to show that the alleged defamatory statements are capable of a reasonable construction that is "innocent," then the defendant will not be liable for defamation. The rule does not apply to this case, however, because defendants have not submitted to this court any

reasonable construction of Jacobson's Perspective that is "innocent."

7. Radutzky apparently had some trouble verbalizing his thoughts at trial because at one point he stated that "I just know that I had disposed of

For several reasons, Radutzky's story is not believable. First, Radutzky's explanation that he was unaware that Brown & Williamson had a right to appeal the initial dismissal is implausible. We do not think it immodest of us to suggest that many people know that an appellate court such as the Seventh Circuit exists. Radutzky, a college graduate who majored in history, worked "constantly" on stories involving legal matters. For a person of his experience, it is completely implausible that he would be unaware that a party who lost in a lower court had a right to challenge the decision in an appellate court. Moreover, Radutzky testified that he had "heard of an appellate process" which is all the knowledge that Radutzky needed to know to omit the documents from his housecleaning operation.

A second factor undercuts Radutzky's "innocent" explanation. Although he was supposedly engaged in a general housecleaning operation, he threw out only part of the FTC report and part of the sample script. Radutzky had no explanation for why he destroyed only certain parts of the documents. The unexplained selective destruction would have allowed (almost compelled) the jury to reach two conclusions. First, Radutzky's "housecleaning" explanation was a complete fabrication. Nobody cleans house as selectively as Radutzky did. Second, because Radutzky destroyed only the parts of the documents that would have contained statements and notations relevant to this litigation, the full documents, if they had been produced, would have severely damaged CBS's case.

In addition, Radutzky had no explanation for why he would be cleaning off Jacobson's desk in addition to his own. Under normal circumstances, it would be difficult to believe that a research assistant would clean off his boss's desk without permission. In this case, Radutzky's story suffers from an additional defect because at the time that he removed documents from Jacobson's desk, he was no longer working for Jacobson and, in fact, no longer worked in the Perspective section of the newsroom.

Radutzky had gone on to become the producer of the 5:00 p.m. news.

In destroying the documents, Radutzky also violated a CBS retention policy that provided:

Once the station is notified of a claim pertaining to any of the following material, the litigation section of the Law Department should be notified and any and all related materials should be retained until specifically released.

Some materials are retained indefinitely on a selected basis. Our policy is to review the files in January to determine what should be selectively retained. Obviously if there is a ... pending legal action, our policy is to retain all pertinent materials unless specifically released by the Law Department.

Radutzky admitted that he was not given permission by CBS's attorneys to destroy any documents but claimed that he was unaware that CBS had a retention policy.

The defendants ask us in exercising independent appellate review to credit Radutzky's testimony. Our review indicates, however, that the evidence overwhelmingly supports an inference that Radutzky destroyed the documents in bad faith. In order for the jury to have credited Radutzky's testimony that the document destruction was not an attempt to conceal evidence of actual malice, it would have had to believe the following: (1) Radutzky was unaware that a party can appeal an adverse judgment of a trial court; (2) Radutzky decided to clean house by disposing of only certain parts of some documents; (3) Radutzky believed that it was his duty to clean off the desk of his former boss; (4) Radutzky did not adhere to the CBS retention policy because he was unaware that it existed. We conclude that the evidence fully supports the jury's decision not to believe Radutzky's "innocent" explanation. Because Radutzky destroyed the documents in bad faith, the jury was allowed to infer that the destroyed documents would have seriously damaged the defendants' case. *See, e.g., Nation-Wide Check,*

[the documents] after I learned that the case had been appealed." After plaintiff's counsel

had the statement read back, Radutzky testified that he, of course, had meant dismissed.

692 F.2d at 217–19. The destruction of the documents is strong evidence of actual malice.

■ Brown & Williamson also points to Walter Jacobson's testimony as evidence of actual malice. Jacobson's testimony revealed that he had received and reviewed Radutzky's sample script prior to delivering the broadcast. In addition, he knew that Radutzky's search for "pot," wine, beer, and sex ads had been unsuccessful. Jacobson had also read the FTC report and was aware that the "pot," wine, beer, and sex language in the report was not from a document prepared by Brown & Williamson but was actually from a document prepared by MARC. Nonetheless, his testimony indicated that he had intended to create the impression that the "pot," wine, beer, and sex comment had been made by Viceroy itself. ("I even said that, 'Viceroy says.' ") His assertion that he intended to create the impression that the "pot," wine, beer, and sex statement was made by Viceroy indicates that Jacobson acted with actual malice since he admitted that he knew that the statement was made by MARC rather than Viceroy.[8]

Defendants cite other Jacobson testimony in support of their argument that Jacobson only inadvertently created the impression that Viceroy was running "pot," wine, beer, and sex ads. Specifically, they contend that the following exchange during Jacobson's direct examination supports their argument:

Question: When you sat down to write this Perspective, and then when you got on the air and delivered it, did you intend to inform your viewers that Viceroy was actually running advertising that contained pot, wine, beer and sex?

Jacobson: No, no way. I didn't say it. I didn't think it. I was reporting on the federal government report. And I put the quotes on the air. And I was not making a statement whatever about advertisements, certain advertisements that might have been implemented. I was simply saying what the report said, that this was a Viceroy strategy, that this strategy might have been there for ten years, twenty years, two years, or whatever.

Defendants ask us to credit this testimony and conclude that because Jacobson did not intend to create a false impression about Viceroy advertising, he did not act with actual malice. Brown & Williamson counters that the language and graphics used in the broadcast itself indicate that Jacobson could not have delivered the broadcast without intending to inform viewers that he was talking about current Viceroy advertising. The district court, in its thorough opinion, dealt with these arguments this way:

[T]he jury could have rejected Jacobson's testimony that he did not intend to communicate a message about actual Viceroy advertising. The theme of the broadcast was cigarette advertising. The statements made in the broadcast relating to the "Viceroy strategy" were made in the context of explaining why so many children take up smoking. The statement was made by Jacobson that television advertising of cigarettes is off limits; so the "killer business has gone to Madison Avenue with a billion dollars a year for bigger and better ways to sell cigarettes." Just prior to describing "the Viceroy strategy," Jacobson stated in the broadcast:

The cigarette business insists, in fact, it will swear up and down in public, it is not selling cigarettes to children, that if children are smoking (which they are, more than ever before), it's not the fault of the cigarette business. "Who knows whose fault it is?" says the cigarette business. "Who knows whose fault it is that children are smoking? It's not ours."

Jacobson immediately goes on to describe "a Viceroy *advertising*, the Viceroy strategy for attracting young people, starters they are called, to smoking." The reference to "Viceroy advertising" and "the Viceroy strategy" at that point

---

8. As discussed in more detail below, even if we were to disregard Jacobson's admission on this point, the other evidence supports the jury's verdict on actual malice.

can be understood as demonstrating how and why children begin smoking, and that it was Viceroy's fault (at least as one advertiser).

A "strategy" that was not implemented, that was nothing more than a report in a drawer, could not explain why children smoke. Only advertising that children see can persuade them of anything.... Jacobson [at the end of the Perspective] stated that the cigarette companies were liars because they were in fact selling cigarettes to children. And the clear message is that Viceroy was doing this through the use of its advertising that relates the cigarette to pot, wine, beer, and sex.

644 F.Supp. at 1250. Judge Hart continued:

[T]he statement made by Jacobson is a powerful statement indicting the cigarette industry and Viceroy in particular. It communicates the message that Viceroy was using actual advertisements to hook children on cigarettes.

The evidence was such that the jury could have found it incredible that Jacobson gave this impression inadvertently. Jacobson is a veteran newsman and commentator who writes hundreds of Perspective scripts each year.... The entire broadcast dealt with methods *actually used* by the cigarette industry to entice children to smoking, such as advertising in popular movies and distributing cigarettes on the street. The visual portion of the broadcast included pictures of cigarettes being distributed to young people on the street. Defendants admitted that this footage was taken from its archives and that Viceroy cigarettes were not being distributed.... [T]he evidence does not support a conclusion that Jacobson inadvertently sent the message that Brown & Williamson was actually using such ads....

644 F.Supp. at 1251 (emphasis in original). We agree with Judge Hart's excellent analysis. The plain language of the broadcast undermines Jacobson's testimony that he did not intend to make a statement about Viceroy's current advertising practices. Moreover, Jacobson's deposition testimony also reveals that he did not accurately testify about his state of mind at the time of the broadcast. At his deposition in the summer of 1984, Jacobson said that he did not remember what he was thinking when he wrote the script and did not even remember writing the script. As Jacobson himself pointed out at the deposition, "[i]t's hard to remember...." We conclude that the evidence supports the jury's decision not to credit his later claim that his recollection had been refreshed.

Disregarding Jacobson's testimony (including his admission that he intended to attribute the MARC language to Viceroy), the evidence shows that Jacobson received and reviewed the FTC report. In addition, he was aware that Radutzky's search for "pot," wine, beer, and sex ads had been unsuccessful and that Brown & Williamson had denied publishing ads implementing the strategy. Defendants argue vigorously that each of these facts, standing alone, cannot provide clear and convincing proof of actual malice. Responsive Brief at 26–31 (citing *Time, Inc. v. Pape*, 401 U.S. 279, 289–92, 91 S.Ct. 633, 639–40, 28 L.Ed.2d 45 (1971) (rational misinterpretation of government report that "bristled with ambiguities" does not create jury issue on actual malice); *Edwards v. National Audubon Society, Inc.*, 556 F.2d 113, 121 (2d Cir.), *cert. denied*, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977) (actual malice cannot be predicated solely on mere denials)); *see also Bose*, 466 U.S. at 511, 104 S.Ct. at 1965 (there is a significant difference between proof of actual malice and mere proof of falsity); *Woods v. Evansville Press*, 791 F.2d 480, 489 (7th Cir.1986) (reporter's journalism skills are not on trial in a libel case). The cases defendants cite are unlike this one because none of them combines a distortion of a government report with a vehement denial of the "pot," wine, beer, and sex charge and an investigation by the journalist that tended to corroborate the denial. Moreover, none of those cases had evidence of document destruction. We conclude that when the intentional destruction of the sample script (which Jacobson did review prior to delivering the broadcast) is considered along with the distortion of the FTC report, Brown & Williamson's

denial, and the corroboration of the denial, Brown & Williamson has met its burden of proving that Walter Jacobson and CBS acted with actual malice.[9]

## IV.

 In general, damage remedies in defamation cases can include: (1) compensatory damages which may be either general or special; (2) punitive or exemplary damages; and (3) nominal damages. *See Sunward Corp. v. Dun & Bradstreet, Inc.,* 811 F.2d 511, 532 (10th Cir.1987) (quoting *Prosser and Keeton on Torts* § 116A (5th ed. 1984)). Illinois adheres to the general rule. *See Babb v. Minder,* 806 F.2d 749, 757–58 (7th Cir.1986) (discussing Illinois law); *see also Erickson v. Aetna Life & Casualty Co.,* 127 Ill.App.3d 753, 83 Ill. Dec. 72, 469 N.E.2d 679 (2d Dist.1984). In seeking compensatory damages, a plaintiff may attempt to prove "special damage, that is, of directly linking specific [economic] loss to the [defamatory material] by competent evidence." *Sunward,* 811 F.2d at 532; *see also Prosser and Keeton on Torts,* § 116A at 844. In certain actions in which the defamatory material is characterized as defamatory *per se,* the plaintiff may recover general compensatory damages without proving special damages. This is called the doctrine of presumed damages and it allows the assessment of damages "without proof by the plaintiff that there [has] been any impairment of reputation." *Prosser and Keeton on Torts,* § 116A at 843. Under that doctrine, presumed damages is "an estimate, however rough, of the probable extent of actual loss a person had suffered and would suffer in the future, even though the loss could not be identified in terms of advantageous relationships lost, either from a monetary or enjoyment-of-life standpoint." *Id.* The doctrine of presumed damages applies to this case because the libelous material prejudiced Brown & Williamson in its trade or business in a manner that is " 'so obviously and naturally hurtful to [Brown & Williamson] that proof of [its] injurious character can be, and is, dispensed with.' " *Brown & Williamson I,* 713 F.2d at 268 (quoting *Reed v. Albanese,* 78 Ill.App.2d 53, 58, 223 N.E.2d 419, 422 (1966)). At trial, Brown & Williamson did not attempt to prove special damages but relied instead on the doctrine of presumed damages. The jury returned a verdict of $3,000,000 in compensatory damages which in this case is composed only of presumed damages. The district court reduced the compensatory damage award to $1.00. 644 F.Supp. at 1260–65. Brown & Williamson appeals that decision.

Punitive damages may also be awarded under Illinois law by a jury when a public figure such as Brown & Williamson proves that a defendant has defamed it with actual malice. *See Babb v. Minder,* 806 F.2d 749, 758 (7th Cir.1986). The purpose of punitive damages, of course, is to punish the defendant for the improper conduct and to deter him from any future transgressions. The jury awarded $2,050,000 in punitive damages against CBS and Jacobson and the district court upheld the award. 644 F.Supp. at 1260–65. In this court, CBS and Jacobson challenge the punitive damage award as both excessive and inappropriate.

### A. *Compensatory Damages*

During the damage portion of the bifurcated trial, Brown & Williamson introduced a variety of evidence intended to show that its reputation had been harmed by Jacobson's statement. First, Brown & Williamson's general counsel testified that after the broadcast there were calls from the field sales force indicating that their con-

---

**9.** Brown & Williamson also argues that pressures to produce interesting stories brought on by the November "sweeps" is "strong proof of actual malice." Ratings during "sweeps" months such as November and May are especially important in determining the rates that advertisers will pay to stations to promote their products. The extent to which journalistic pressures to produce can constitute evidence of actual malice has caused some debate among members of the federal bench. *Compare Tavoulareas v. Piro,* at 796–97 *with Tavoulareas,* at 833–35 (MacKinnon, J., dissenting). Because we have concluded that there is clear and convincing evidence of actual malice without considering the "sweeps" evidence, we need not enter this debate. We do note that CBS has not objected to the district court's admission of the "sweeps" evidence.

tacts were asking "how in the world could Brown & Williamson have done such a thing." Second, a department sales manager for Brown & Williamson testified that sales managers in the Chicago area had received negative comments from distributors, retailers, and consumers. The reports he received indicated that the sales staff had been disrupted in their normal activities by questions from retailers and consumers about the broadcast. Third, the former Vice President of Marketing for Brown & Williamson testified that the company had a reputation it cared about and that he believed that Viceroy's customers care about the reputation of the company from which they buy cigarettes. He also testified that the company's reputation among governmental entities was important because the cigarette industry is such a closely regulated industry. Fourth, the company introduced evidence that the Perspective (including its rebroadcasts) was seen by over 2.5 million people in the Chicago area. In addition, over two million people read a 1984 article in the *Saturday Evening Post* which repeated some of the most damaging portions of the Perspective. Brown & Williamson also argued that the Perspective was especially devastating because Chicago area viewers believe that Jacobson's Perspectives are reliable.

Although Brown & Williamson asked the jury for $7,000,000 dollars in compensatory damages, the jury was only willing to award $3,000,000. In setting aside the award, the district court relied primarily on the failure of Brown & Williamson to put forth any evidence that "Viceroy lost sales, lost a distributor, lost profits, or had an employee quit or stop working as effectively and enthusiastically as he used to, or that any individual stopped smoking Viceroys." 644 F.Supp. at 1261. The court concluded that "[Brown & Williamson] clearly did not prove any actual damages...." *Id.* The district court recognized that this was a case of libel *per se* and that therefore Brown & Williamson

was entitled to presumed damages. *See Brown & Williamson I*, 713 F.2d at 267–69. Nonetheless, it set aside the damage award.

■ In addition to the failure to prove any pecuniary damages, the court cited two other reasons for its decision to reduce the damage award to $1.00. First, the court held that under Illinois law, substantial damages are not presumed. 644 F.Supp. at 1261 (citing *Bloomfield v. Retail Credit Co.*, 14 Ill.App.3d 158, 170, 302 N.E.2d 88, 97 (1st Dist.1973)). Second, the court found that any residual effect of the broadcast was greatly reduced if not eliminated by the jury's verdict in favor of Brown & Williamson and the accompanying publicity.[10]

■ The district court incorrectly relied on Brown & Williamson's failure to prove any actual damages such as lost sales. As noted above, under Illinois law, Brown & Williamson could choose, as it did, to forego any proof of special damages and seek to recover compensatory damages under the doctrine of presumed damages. *See Babb v. Minder*, 806 F.2d 749, 757–58 (7th Cir.1986) (applying Illinois law). Brown & Williamson is entitled in this case to recover under the doctrine of presumed damages because Jacobson's Perspective was libelous *per se*. *See Brown & Williamson I*, 713 F.2d at 268–69; *see also Brown v. Farkas*, No. 85–3012, slip op. at 5 (1st Dist. Dec. 31, 1986) (presumed damages, which include injury to reputation, "arise by inference of law and are not required to be proved by evidence") (petition for rehearing pending).

It is true that the harm to Brown & Williamson's reputation cannot be measured easily. *See Brown & Williamson I*, 713 F.2d at 269. As the Tenth Circuit recently stated, "[a]scertainment of presumed general damages is difficult at best and unavoidably includes an element of

---

10. The court was correct in holding that testimony that employees were emotionally upset is not relevant because a corporation is not capable of mental suffering, which ordinarily will be an important component of an individual's damage award for libel. *See Gertz v. Robert*

*Welch, Inc.*, 680 F.2d 527, 540 (7th Cir.1982), cert. denied, 459 U.S. 1226, 103 S.Ct. 1233, 75 L.Ed.2d 467 (1983). Although a corporation is not capable of mental suffering, it is of course still entitled to be compensated for damage to its reputation.

speculation." *Sunward Corporation v. Dun & Bradstreet, Inc.,* 811 F.2d 511, 538 (10th Cir.1987).[11] Nonetheless, presumed general damages are permissible under Illinois law and under the United States Constitution. *Babb,* 806 F.2d at 758. The failure to prove specific pecuniary damages does not in any way impair the right of Brown & Williamson to recover for the libelous broadcast. In fact, an attempt to show specific pecuniary loss, while still electing the presumption of general damages, is under certain circumstances impermissible. *See Sunward,* 811 F.2d at 539. We conclude that in setting aside the damage award the district court impermissibly took into account Brown & Williamson's failure to show specific pecuniary harm.

Brown & Williamson also challenges the district court's conclusion that media coverage of its victory at trial was "fair" and therefore it "ameliorates whatever injury Brown & Williamson might have ... suffered." 644 F.Supp. at 1262. In making its finding, the court took judicial notice of the "fact" that the coverage of the liability verdict was "fair." "Fair" media coverage is not the kind of undisputed "fact" that is proper for judicial notice. *See* Fed.R.Evid. 201(b). In addition, even if the media coverage could be characterized as fair, it does not necessarily mean that the effect of the libelous statements will be ameliorated. For example, much of the post-verdict publicity reported Jacobson's vehement denials of the charges and included assurances by the defendants that, like many libel defendants, they would be victorious in the appellate court. Moreover, some of the commentary that occurred in the wake of the verdict questioned the correctness of the verdict and included some suggestions that the defendants had lost simply because they were "out-lawyered." We conclude that the district court erroneously relied on the post-verdict publicity in setting aside the damage award.

In striking the compensatory damage award, the district court also relied on a statement in an Illinois appellate court decision that substantial damages are not presumed. 644 F.Supp. at 1261 (citing *Bloomfield v. Retail Credit Co.,* 14 Ill.App.3d 158, 302 N.E.2d 88 (1st Dist.1973)). In *Bloomfield,* the Puritan Life Insurance Company had requested a background report on Harold Bloomfield whom it was considering for a position as an insurance agent. The defendant in *Bloomfield,* the Retail Credit Company, supplied a background report to Puritan that contained defamatory material about Bloomfield. Bloomfield became aware of the defamatory report through a friend at another company who, apparently out of curiosity, had requested the report on Bloomfield. After the friend notified Bloomfield of the defamatory material, Bloomfield contacted Retail Credit and arranged a meeting. Following the meeting and some further investigation, Retail Credit's report was amended in October 1964 to exclude most (and perhaps all) of the incorrect defamatory material. The amended report was sent to Puritan and negotiations between Bloomfield and Puritan continued until November 1964. However, no employment agreement was ever signed.

The jury in *Bloomfield* awarded $50,000 in compensatory damages and $100,000 in punitive damages. The appellate court ordered a new trial on damages because there was a great deal of improperly admitted evidence that probably prejudiced the jury. For example, although the evidence showed that the defamatory report had

---

11. Ascertainment of actual damages is often not much easier. This is why it "has been the experience and judgment of history that 'proof of actual damage will be impossible in a great many cases ...' W. Prosser, Law of Torts § 112 ... As a result, courts for centuries have allowed juries to presume that some damage occurred from many defamatory utterances and publications.... This rule furthers the state interest in providing remedies for defamation by ensuring that those remedies are effective."

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 760–61, 105 S.Ct. 2939, 2946, 86 L.Ed.2d 593 (1985) (plurality opinion). The reason for such a rule is illustrated by this case. Even if Brown & Williamson were able to show that there was a decline in Viceroy sales after Jacobson's Perspective, it would be extremely difficult to prove that the decline was the result of the libelous broadcast. *Cf. Sunward,* 811 F.2d at 539–41 (discussing flaws in a specific actual damage theory).

been sent to only one potential employer (Puritan), the plaintiff was allowed to introduce evidence that "permitted the jury to conclude that plaintiff was forever barred from further reasonable employment...." 14 Ill.App.3d at 171, 302 N.E.2d at 98. In addition, Bloomfield's counsel had suggested during his opening statement that the President of Puritan would testify that he had refused to hire Bloomfield because of the Retail Credit report. *Id.* No such evidence was introduced at trial and there was some indication in the record that Puritan's refusal to hire Bloomfield was unrelated to the Retail Credit Report. *Id.* In short, the evidence showed that there had been only one publication of the defamatory material, that it had been corrected only one month after it was issued, and that it may not have had any effect at all on Bloomfield's employability with Puritan. It was in this context that the appellate court made the statement that *"substantial* damages are not presumed." 14 Ill.App.3d at 170, 302 N.E.2d at 97 (emphasis in original).

In *Bloomfield,* it was clear to the appellate court that $50,000 in compensatory damages was excessive. The defamatory material was published to only one potential employer and because it was corrected promptly, it had very little effect on Bloomfield's reputation in the community. There was also a serious question whether the report had any significant impact on Bloomfield's relationship with Puritan. We conclude that *Bloomfield* provides us with very little assistance in deciding this case. It simply gives a broad guideline that substantial damages, a term whose meaning is not clear, will not be presumed.

A case decided subsequent to the district court's decision here provides us with some additional assistance in interpreting the meaning of substantial damages. In *Costello v. Capital Cities Communications,* 153 Ill.App.3d 956, 106 Ill.Dec. 154, 505 N.E.2d 701 (5th Dist.1987) (petition for review pending), the plaintiff, Jerry Costello, sued the Belleville News-Democrat which is a general circulation newspaper in St. Clair County, Illinois. Costello, who had just been elected Chairman of the County Board of St. Clair County, was attacked in a December 31, 1980, editorial as a Chairman who "blew his first chance" because he had failed at his first board meeting to "militantly oppose the implementation of any new tax without first seeking the voters' approval through a referendum." The editorial stated that this action had run directly contrary to what he had promised the newspaper when he had sought and received its endorsement. The paper accused Costello of lying and concluded its editorial with the observation "[j]ust think, we've got two more years of the Costello brand of lying leadership." The jury award Costello $450,000 in presumed damages. The appellate court agreed with the defendants' assertion that substantial damages may not be presumed, 153 Ill.App.3d at 973, 106 Ill.Dec. at 163, 505 N.E.2d at 712 (citing *Bloomfield*), and reduced the jury award to $200,000. The $200,000, while perhaps not "substantial" under Illinois law, certainly is a sizable figure especially when one considers that the editorial apparently had no effect on Costello's political career because he was re-elected as Chairman in 1982.

■ We read the holding in *Costello* as advising an appellate court to give some deference to the jury's determination of presumed damages while also considering whether it considers the jury award of presumed damages excessive. If it finds the award excessive, the court may exercise its discretion and reduce the award to what it considers a more appropriate figure. One obvious factor in deciding how much deference to give a jury verdict on presumed damages is the extent to which the court believes that the jury may have been carried away by passion and prejudice. *See Douglass v. Hustler Magazine,* 769 F.2d 1128, 1143 (7th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1489, 89 L.Ed.2d 892 (1986). In this case, the jury appears not to have been carried away by passion and prejudice. Brown & Williamson asked for $7,000,000 in presumed damages but the jury only awarded $3,000,000. Brown & Williamson asked for $10,100,000 in punitive damages but the jury awarded only $2,050,000. At the very least, both of these awards indicate that the jury was not mere putty in the hands of the plaintiff.

The strongest evidence that the jury was not carried away by passion and prejudice is its award of only $50,000 in punitive damages against Jacobson. Brown & Williamson had asked for $100,000 which in light of Jacobson's net worth of over $5,000,000 does not strike us as an especially absurd figure to seek as punitive damages. Nonetheless, the jury, despite hearing evidence of post-verdict recalcitrance (Jacobson said he would not hesitate to deliver the same broadcast again), assessed a reasonable punitive damage figure against Jacobson personally. We conclude that the jury was not carried away by passion and prejudice and that it fulfilled its duty in attempting to assess a reasonable amount of compensatory damages.

Although the jury did conscientiously fulfill its duty in this case, we are hesitant to uphold the entire award. Illinois law requires appellate courts to examine jury awards under the doctrine of presumed damages with great care to determine whether they are "substantial" or within an acceptable range. See Costello; Bloomfield; cf. Brown v. Farkas, slip op. at 10 (reducing punitive damage award from $1,000,000 to $50,000). We hold that an award of $1,000,000 in compensatory damages is appropriate in this case. The $1,000,000 in presumed damages is sizable but on the facts of this case it is not "substantial" under Illinois law. We grant that it is difficult to draw a distinction but that in effect is what the Costello court calls for in applying the test. Unlike Costello, this broadcast was made not in a relatively small community but in one of the largest television markets in the country. The defamatory material here was not published once but was broadcast four separate times and was seen by a total viewership of approximately 2.5 million people. It was delivered on what was the most popular news broadcast in Chicago and was delivered by a veteran journalist who was trusted by the public and promoted by his employer as someone who "always leaves you informed." Moreover, the text of the broadcast carried a very substantial sting that must have hurt both the reputation of Brown & Williamson and its parent company (which as CBS's counsel pointed out at trial owns one of the most respected department stores in Chicago). In addition, the libelous material was a television broadcast and not a newspaper editorial. Television is a more intense and more focused medium. It allows the libeler to come into peoples' homes and deliver essentially in person a powerful libelous statement using various voice inflections to add power to the message. Television also allows for the use of graphics to emphasize the libelous material. Our review of the videotape of the broadcast indicates that Walter Jacobson relied on these attributes of television using both graphics and voice inflections to further convince the viewer that Brown & Williamson was using a "pot," wine, beer, and sex strategy to attract children to Viceroy cigarettes. We agree with the district court that the message that Jacobson delivered was an extraordinarily powerful one. We also conclude that the power of Jacobson's Perspective was greatly enhanced because of the medium through which it was delivered.

We recognize that this is a very inexact and somewhat arbitrary process. Nonetheless, the process is inherent in the doctrine of presumed damages. An appellate court must, under Illinois law, use its judgment in determining the extent to which a jury award of presumed damages will be upheld. Our judgment is $1,000,000.

### B. *Punitive Damages*

Punitive damages are available under Illinois law when a plaintiff has proven actual malice. See Brown, slip op. at 10; see also Babb, 806 F.2d at 758.[12] Several factors can be considered by the jury in arriving at a punitive damage award. First, and most importantly for purposes of this case, the jury was entitled to consider the amount of attorney's fees incurred by the plaintiff in bringing the libel action. See Hazelwood v. Illinois Central Gulf

---

12. Without citing any authority, the Costello court held that "where actual malice is the gist of an action for libel, as here, both compensatory and punitive damages cannot be recovered." 153 Ill.App.3d at 976, 106 Ill.Dec. at 166, 505 N.E.2d at 713. Costello stands alone among the Illinois cases and consequently we decline to follow it. See Babb, 806 F.2d at 758.

*Railroad,* 114 Ill.App.3d 703, 711, 71 Ill. Dec. 320, 327, 450 N.E.2d 1199, 1206 (4th Dist.1983); *Anvil Investment Limited Partnership v. Thornhill Condominiums,* 85 Ill.App.3d 1108, 1121, 41 Ill.Dec. 147, 156, 407 N.E.2d 645, 654 (1st Dist.1980); *Glass v. Burkett,* 64 Ill.App.3d 676, 683, 21 Ill.Dec. 494, 499, 381 N.E.2d 821, 826 (5th Dist.1978). Second, the jury was entitled to take into account the defendants' wealth. *See Hazelwood,* 114 Ill.App.3d at 113, 71 Ill.Dec. at 328, 450 N.E.2d at 1207 (punitive damages should be large enough to provide retribution and deterrence but should not be so large that the award destroys the defendant). Finally, because the purpose of punitive damages is deterrence, the jury was entitled to consider evidence of post-verdict recalcitrance in determining the punitive damage award. *See Goldwater v. Ginzburg,* 414 F.2d 324, 341 n. 27 (2d Cir.1969), *cert. denied,* 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970).

Taking only the first two factors into account, we conclude that the district court's decision upholding the jury's punitive damage award was clearly correct. Brown & Williamson's attorney's fees were $1,360,000 prior to post-trial motions. Jacobson's net worth including his contract with CBS was over $5,000,000, while CBS's net worth was approximately one and one-half billion dollars. The punitive damage award of $50,000 against Jacobson is a modest one considering his net worth. *See Brown,* slip op. at 10. It might provide some deterrent value without being destructive. In light of the attorney's fees that Brown & Williamson incurred and CBS's substantial net worth, the $2,000,000 award against CBS is reasonable. The award might provide some deterrence to future misconduct and yet will not burden CBS with a debt that it cannot easily discharge.[13] *See also Gertz v. Robert Welch, Inc.,* 680 F.2d 527, 540 (7th Cir.1982), *cert. denied,* 459 U.S. 1226, 103 S.Ct. 1233, 75 L.Ed.2d 467 (1983) (upholding $300,000 punitive damage award).

13. Defendants also argue that the punitive damage award violates the Eighth Amendment which provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

## V.

One of the most important functions of the court system in the United States is to protect the freedom of the press. *See, e.g., Bose v. Consumers Union,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); *New York Times v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The federal courts of appeals including this one have played an important role in fulfilling this function. *See, e.g., Tavoulareas v. Piro,* 817 F.2d 762 (D.C.Cir.1987) (en banc); *Sunward Corporation v. Dun & Bradstreet, Inc.,* 811 F.2d 511, 538 (10th Cir. 1987); *Woods v. Evansville Press,* 791 F.2d 480, 489 (7th Cir.1986). In considering the merits of this case, this court has granted the defendants the fullest possible review; the standard of review that we have used, giving essentially no deference to the jury's findings, may be far broader than the review to which the defendants are entitled. *See Bose,* 466 U.S. at 499–500, 104 S.Ct. at 1958–59 (constitutionally based rule of independent review permits reviewing court to give "due regard" to the trial court's opportunity to observe the demeanor of the witnesses). After conducting such a review, it is unfortunate that we are forced to conclude that this case does not involve freedom of the press. Rather, it is one in which there is clear and convincing evidence that a local television journalist acted with actual malice when he made false statements about Brown & Williamson Tobacco Corporation. Because false statements of fact made with actual malice are not protected by the First Amendment, this court is required to affirm the district court's finding that Jacobson and CBS libeled Brown & Williamson.

Affirmed in Part, Reversed in Part.

Even if we were to accept the defendants' argument that the excessive fines clause applies to civil proceedings, we conclude that the punitive damage award in this case is not excessive.