Donald J. DIESEN, Appellant,

v.

John HESSBURG, et al., Respondents.

No. C2–88–1345.

Court of Appeals of Minnesota.

March 28, 1989.

Patrick T. Tierney, Collins, Buckley, Sauntry & Haugh, St. Paul, for appellant.

Thomas R. Thibodeau, Joseph J. Roby, Jr., Johnson, Killen, Thibodeau & Sieler, P.A., Duluth, for respondents.

Heard, considered and decided by SHORT, P.J., and NIERENGARTEN and NORTON, JJ.

## OPINION

NORTON, Judge.

This is an appeal from a judgment notwithstanding the verdict (JNOV) granted to respondents John Hessburg and the Duluth News–Tribune in a libel action. The jury had found by special verdict that an article published by respondents was defamatory to appellant Donald Diesen, that the implication of the article was substantially false, that Diesen demonstrated by clear and convincing evidence that respondent published the article with reckless disregard as to the truth of the implication of the article, and that Diesen had proved by clear and convincing evidence that the article was published wilfully, maliciously and with the intent to injure Diesen. The jury awarded Diesen $280,000 in compensatory damages and $500,000 in punitive damages.

The trial court granted the JNOV stating that there can be no action for libel based on false implications arising from a series of true facts and opinions, and alternatively that any implication of the article was protected because it was the mere opinion of the author, the publisher or the article's sources. We reverse.

## FACTS

Appellant Donald Diesen was 54 years old at the time the subject article, consisting of three stories (*Is justice denied battered women in Carlton County?, County Attorney Donald Diesen Critics say he's not tough on domestic abuse, Justice Denied? The case of Kathy Berglund*), was printed on November 15, 1981 in the Duluth News–Tribune (article). Diesen graduated from the University of Minnesota Law School in 1956 and first became involved in the Carlton County Attorney's office in the summer of 1969. Diesen was appointed Carlton County Attorney in 1970 and thereafter won elections in 1970, 1974 and 1978. He did not run for re-election in 1982, as a result of the subject article.

Respondent John Hessburg was hired as a reporter for respondent Duluth News–Tribune in February 1981. Hessburg voluntarily quit September 30, 1981, after he completed writing the subject article.

Hessburg started working on the article in the spring of 1981. Hessburg began his investigation as a result of a complaint which had been called into the paper about the lack of prosecution of domestic abuse cases in Carlton County. In April 1981, Hessburg met with a group of advocates of the battered women, including Kathy Moore and LuAnn Dietrich of the Duluth's Women's Shelter, and Dale Lucas, attorney for Kathy Berglund, a battered woman. Berglund and Jennifer Greensky, also a battered woman, were also present at this meeting. The advocates and victims brought to Hessburg's attention their claims that there were problems with Carlton County's prosecution of domestic abuse cases.

According to Diesen, the same advocates had met with Diesen in September 1980 in order to pressure Diesen to issue felony charges for an assault that occurred to Kathy Berglund on September 1, 1980. Diesen refused to press felony charges in this matter because Berglund had given a statement to Sheriff Twomey of Carlton County, stating that she could not remember the assailant Melvin Defoe beating her,

and that she had had six drinks immediately prior to the attack.

In his investigation, Hessburg spoke first with the battered women's advocates and some of the women who had made allegations. After interviewing these people, Hessburg examined every initial complaint report (ICR) on every assault in Carlton County. Eventually, Hessburg reduced the several thousand ICR's to 44 which involved domestic assault. Hessburg developed flow charts which indicated the dispositions of these 44 cases. Hessburg ascertained who had dealt with the women involved in the assaults on their way through the judicial system. However, the article did not state that Diesen had contact with only ten of these cases.

From the outset of his investigation, Hessburg's notes refer to this as "the Diesen probe." In April 1981, Hessburg told Berglund that the story he was writing was on "possible abuses of power by a certain county attorney." In reading Hessburg's notes shortly after he left the paper, Dennis Buster, an editor for the Duluth paper, found that Hessburg had lost his objectivity. After the initial interviews where the people had expressed unfavorable opinions about Donald Diesen, Hessburg set up interviews with Diesen and his supporters.

Hessburg's interview with Diesen lasted 11½ hours. This interview was taped by Hessburg, however, approximately five hours of this interview are not on tape. Diesen alleges that portions of the interview favorable to Diesen were erased or taped over by Hessburg.

Not all of the allegations by the battered women were contained in the article. Specifically, the allegations by Jennifer Greensky were found not to be credible by the editors and Hessburg and, therefore not used in the article. However, a statement made by Greensky was repeated often by Hessburg while interviewing advocates and other battered women while questioning them about Diesen. Greensky had claimed that she had been raped in the early 1970's while only 15 years old, in a car on a deserted road in winter. When Greensky went to Diesen, Diesen allegedly asked her whether this was the first time she had ever spread her legs. Diesen adamantly denied ever saying this, and the editors of the paper also found that this was not true. However, Hessburg never relayed this to people to whom he had reported the statement.

While Hessburg interviewed numerous people who had unfavorable views about Diesen, Hessburg never asked Diesen for any sources who might give an opposing view. Sheriff Twomey and Patrol Officer Randelin were favorable to Diesen and said so to Hessburg. However, both of these people thought Hessburg's questions were misleading, vindictive and begged an answer which Hessburg wanted, which would be unfavorable to Diesen. Editor Buster's notes also indicate that Hessburg was suggesting to subsequent sources the idea of a special panel to probe the way Diesen handled battering cases.

All of Hessburg's material was reviewed by his editors. The editors testified that they independently confirmed Hessburg's information prior to publishing the article. Georgia Swing, city editor, went to the county courthouse to verify the disposition of the files and the information used by Hessburg. On a second visit, Swing was accompanied by Dennis Buster, also a city editor. Buster also spent several hours listening to the tapes Hessburg had made of interviews with witnesses. Afterwards, Buster reported to Larry Fortner, managing editor, that there were no inaccuracies that he was able to find between what was on the tape and what had been written by Hessburg. Fortner testified that the article contained only information that was available through public records or which was attributed to some named source. Thomas Daly, executive editor of the paper in 1981, and John McMillion, publisher of the newspaper in 1981, both testified that they knew of nothing false in the article. However, the editors and the publishers testified that they knew that the implication of the article was that Diesen had committed malfeasance or misfeasance in

office in failing to prosecute domestic assaults.

While the underlying facts in the story were true, and the defamatory references to Diesen were opinions of the advocates and battered women, Diesen claims that the whole implication of the article was libelous because facts were intentionally omitted from the article, the juxtaposition of facts within the article created a false implication, and Hessburg's malicious investigative techniques created negative opinions about Diesen.

Significant facts which were not included in the article relate to the assault on Kathy Berglund and its disposition. The article correctly states that Diesen plea bargained the felony assault charge to a misdemeanor. However, the article failed to mention that Kathy Berglund had told the assailant's probation officer that she believed chemical dependency treatment was more appropriate for Melvin Defoe, the assailant. The article also neglected to mention that Diesen had requested jail time for Defoe. The article also failed to mention that Berglund admitted that she was unwilling to go through any court process at that point in time. Buster admitted that he was aware of these omissions prior to publishing the article. By the omission of these facts, the reader is left with the view that even though Berglund was severely assaulted by this man, Diesen did not believe it merited felony prosecution due to several reasons stated as opinions in the article, namely, that he was more concerned with his win-loss record and his own personal view that the criminal forum is not the proper place for domestic disputes.

## ISSUES

I. Did the trial court err in granting JNOV, and in holding there could be no defamation by implication in this case?

II. Did the trial court err in holding that the article is protected as being an opinion of the reporter or of the newspaper?

## ANALYSIS

### I.

■ When a public official is involved, as in this case, constitutional guarantees of the first amendment preclude recovery by a public official for defamation unless the official can prove with "convincing clarity" that the statement at issue was made with "actual malice." *New York Times v. Sullivan*, 376 U.S. 254, 285–86, 279–80, 84 S.Ct. 710, 728–29, 725–26, 11 L.Ed.2d 686 (1964). Actual malice has been defined as "knowledge that [such statement] was false or * * * reckless disregard of whether it was false or not." *Id* at 280, 84 S.Ct. at 726. The question of actual malice is not whether the statement was made with ill will, although a showing of ill will may be relevant to show a state of mind which may be subject to reckless disregard of the truth. *See Cochran v. Indianapolis Newspapers, Inc.*, 175 Ind.App. 548, 372 N.E.2d 1211, 1220 (1978).

In general, the granting of a judgment notwithstanding the verdict is a pure question of law. *Edgewater Motels, Inc. v. Gatzke*, 277 N.W.2d 11, 14 (Minn.1979). The question of law before the trial court and this court is whether, viewing the evidence in the light most favorable to appellant, there is a reasonable basis for the verdict. *Id.*

■ However, when determining actual malice in a defamation action subject to the standards of *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the appellate court "must exercise independent judgment and determine whether the record establishes actual malice with convincing clarity." *Bose Corp. v. Consumers Union*, 466 U.S. 485, 514, 104 S.Ct. 1949, 1967, 80 L.Ed.2d 502 (1984). *Bose* does not specifically state what amount of deference a reviewing court is to give to the trier of facts' opportunity to judge the witnesses' credibility, whether that be a trial court or a jury. *See Brown & Williamson Tobacco Corp. v. Jacobson*, 827 F.2d 1119, 1128 (7th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 1302, 99 L.Ed.2d 512 (1988). Under one view, *Bose's* mandate of de novo review means

with no deference at all to be accorded any jury finding germane to actual malice. Under the contrary view, *Bose* does not alter the traditional rules governing the review of jury verdicts and thus judicial deference is constitutionally mandated to presume jury verdict findings of underlying facts, evaluations of credibility, and the drawing of inferences. *See Tavoulareas v. Piro,* 817 F.2d 762, 776–77 (D.C.Cir.1987).

In *Brown & Williamson,* the appellate court gave little or no deference to the jury's findings; however, the court admitted that it was incapable of making credibility determinations, and found that whatever the standard of review in *Bose,* when the record fully supports a jury's verdict, the court is required to affirm the jury verdict. *See Brown & Williamson,* 827 F.2d at 1129. We agree with the Seventh Circuit that where the record fully supports the jury's verdict, as in this case, the court is required to affirm the verdict.

Diesen contends 1) that a libel action may lie where a series of true facts and mere opinions leads to a false implication; 2) that the false implication of the article was clearly understood by the jury; and 3) that there was competent evidence supporting the jury's findings that the implication of the article published by respondents was substantially false. The trial court found that there can be no libel action where a false implication is the result of a series of true statements and opinions, and further found that the implication was too vague to constitute a defamation action.

■ Whether a defamatory implication can be found is first a legal question for the court to decide, before determining whether it should be sent to the jury. *Memphis Publishing Co. v. Nichols,* 569 S.W.2d 412, 419 (Tenn.1978). The Minnesota Supreme Court has recognized that true statements can convey a false impression. *Lewis v. Equitable Life Assurance Society,* 389 N.W.2d 876, 889 (Minn.1986). The burden of proof in proving a falsity in a statement or implication is on the plaintiff. *See Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 776, 106 S.Ct. 1558, 15, 89 L.Ed.2d 783 (1986).

■ Diesen relies on *Memphis Publishing Co. v. Nichols,* 569 S.W.2d 412 (Tenn. 1978), in his argument that there can be a false implication based on true individual statements of facts or opinions. In *Nichols,* a private citizen was allegedly defamed by the implication that she was having an adulterous affair with a neighbor's husband. If all the facts had been printed by the paper, this defamatory and false implication would not have been created. The court in *Nichols* stated that the defendant's reliance on the truth of the facts was misplaced because the question was "whether libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id.* at 420 (quoting *Fleckenstein v. Friedman,* 266 N.Y. 19, 23, 193 N.E. 537, 538 (1937)). The publication of the complete facts could have conceivably led the reader to conclude that there was no adulterous relationship.

> The published statement, therefore, so distorted the truth as to make the entire article false and defamatory. It is no defense whatever that individual statements within the article were literally true. Truth is available as an absolute defense only when the defamatory meaning conveyed by the words is true.

*Id.*

We agree with the holding in *Nichols.* There may be defamation by implication, where known facts are omitted, which could have changed the defamatory implication of the article. It is clear that this is a half-truth, which amounts to merely a lie. Defamation by implication is further discussed in Prosser, *The Law of Torts* § 116, 5th Ed. (Supp.1988), which states:

> The rule that makes truth relevant to the "gist" or "sting" of the publication protects the defendant who has got the details wrong but the "gist" right; but it also works in reverse, *to impose liability upon the defendant who has the details right but the "gist" wrong.* Thus, if the defendant juxtaposes the series of facts so as to imply a defamatory connection between them, or *creates a defamatory implication by omitting facts,* he

may be held responsible for the defamatory implication, unless it qualifies as an opinion, even though the particular facts are correct.

(Emphasis added).

The trial court and respondents rely on *Strada v. Connecticut Newspapers, Inc.*, 193 Conn. 313, 477 A.2d 1005 (1984), in arguing that there can be no libel by innuendo, if the challenged communication is true and concerns public officials and public affairs, even though a false implication may reasonably be drawn by the public. However, upon closer examination of the actual holding in *Strada*, we believe *Strada* does not stand for this proposition. *Strada* states:

> * * * in the instant case, the plaintiff seeks to recover from a publication where all the underlying and stated facts have been proved to be true, or substantially true, claiming that the "slant" of the article gives rise to allegedly false and defamatory implications. Unlike *Memphis Publishing Co. v. Nichols*, supra, the plaintiff here has not alleged nor has our examination of the record disclosed, the existence of additional material facts which, if reported, would have changed the tone of the article. *In the absence of such undisclosed facts,* first amendment considerations dictate that an article concerning a public figure composed of true or substantially true statements is not defamatory regardless of the tone or innuendo evident.

*Id.*, at 323, 477 A.2d at 1010 (emphasis added).

In the present case, there was evidence produced at trial to show that the reporter and his editors were aware that substantial facts were omitted regarding the Kathy Berglund story, which would have changed the tone of the article. Therefore, this case is distinguishable from *Strada*, and there may be defamation by implication.

We believe the numerous cases cited by respondents can be distinguished. In each of these cases, one of the necessary factors for libel was not met, in denying a claim for defamation by implication of a public official. *Garrison v. State of Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) (no defamation by general allegations of incompetency of a public official, because protected by the first amendment); *Hirman v. Rogers,* 257 N.W.2d 563 (Minn. 1977), and *Valento v. Ulrich,* 402 N.W.2d 809 (Minn.Ct.App.1987) (malice cannot be presumed or inferred, but must be actually proven by a public official); *Schaefer v. Lynch,* 406 So.2d 185 (La.1981) (no defamation because article was factually correct even though written with actual ill will and malice by the reporter); *See Hein v. Lacy,* 228 Kan. 249, 616 P.2d 277 (1980) (state senator not defamed when campaign brochure said he voted to decriminalize pot and legalize homosexuality, because both statements were true or substantially true and no additional facts were omitted); *Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 397 N.Y.S.2d 943, 366 N.E.2d 1299 (1977) (allegedly defamed judge could not prove statement that he was "probably corrupt" was false or said with actual malice; and mere derogation of a public official is not actionable).

■ In the present case, the trial court held that even though the jury found a defamatory implication which was substantially false, this implication was too vague to be actionable. Appellant in his opening statement and in his closing argument, and through testimony of the reporter, the editors, and the publisher argued to the jury that the specific implication of the article was that Diesen committed misfeasance or malfeasance in office. It is clear that appellant adequately argued, and there is competent evidence to support the jury's finding, that there was a defamatory implication which was substantially false. An implication of misfeasance or malfeasance is more than a vague derogation of a public official, and more than a general allegation of incompetency of a public official.

■ We believe there is sufficient evidence to find that the article conveyed a defamatory implication which was substantially false, which could have been changed if known facts were included. Additionally, Diesen proved by clear and convincing evidence that respondents published the ar-

ticle with reckless disregard as to the truth or falsity of the implication of the article; and that the article was published wilfully, maliciously and with the intent to injure Diesen. Under these circumstances, the jury could properly find defamation of Diesen by respondents. Accordingly, we reverse the trial court on this issue.

## II.

█ Respondents argue that even if the implication of the article suggests misfeasance or malfeasance by Diesen in office, it is constitutionally protected because it is the opinion of the sources, the reporter, or the newspaper as a whole. The trial court found that the article was opinion and therefore protected. Whether a statement is one of opinion and absolutely protected by the first amendment is a question of law for the trial court and for this court. *See Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1305, n. 7 (8th Cir.1986), *cert. denied* 479 U.S. 883, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986); *Erven v. Provost*, 413 N.W.2d 861 (Minn.Ct.App.1987), *pet. for rev. denied* (Minn. Nov. 24, 1987).

This court has adopted the four factors to be used in distinguishing statements of fact from statements of opinion as set forth in *Janklow*. *Capan v. Daugherty*, 402 N.W.2d 561, 563 (Minn.Ct.App.1987). These four factors must be considered as a whole. *Id.* at 564. The four factors are:

1. the precision and specificity of the disputed statement (the more imprecise, the more likely opinion);
2. the statements' verifiability (the less verifiable, the more likely opinion);
3. the literary and social context in which the statement was made (including the entire communication's tone, the use of cautionary language, the category of publication, its style of writing and intended audience); and
4. the statement's public context (consideration of the public or political arena in which the statement was made).

*Janklow*, 788 F.2d at 1302–03.

Respondents argue that the first factor, precision and specificity of the statement, is totally lacking. Respondents argue that there is merely a nebulous innuendo which some people might find. However, respondents have been able to find a precise implication and stated before publication that the implication was one of malfeasance or misfeasance by Diesen in office. Additionally, there are specific examples as to Diesen's inadequacy. The article specifically stated that Diesen was overly concerned about his win-loss record, and did not want to go to trial because of his hearing impairment, or because of his personal view regarding domestic relations.

The second factor under *Janklow* is verifiability. Diesen's motives for prosecuting or not prosecuting cases are unverifiable. However, disposition of the cases and the police reports which include facts, are clearly verifiable.

The next factor under *Janklow* which we need to analyze is the public context in which the statement was made. In the present case, Diesen was an elected official and participated in public debate and could expect to be the focus of criticism or controversy in his position. This is similar to the tobacco company in *Brown & Williamson Tobacco Co. v. Jacobson*, 827 F.2d 1119 (7th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 1302, 99 L.Ed.2d 512 (1988), where the merits of smoking and the advertising technique of the tobacco companies were open to regular public debate. *Id.* at 1122. It is conceded that critique of a public official's job performance is deemed to be a matter of public opinion for purposes of defamation. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 337–38, 94 S.Ct. 2997, 3005–06, 41 L.Ed.2d 789 (1974).

The final factor is the literary and social context of the article. The quotations are attributed to named sources in the article which respondents say shows cautionary language. However, this is not the most important point of the final factor. The crucial factor in the analysis is that respondents, themselves, believed they were doing an investigative report and that the readers would take the article as such, and draw their own inferences from it. Even though portions of the article were printed in the focus/editorial section of the paper,

respondents, specifically Hessburg, testified that the article was not his opinion, but was a factual report.

The present case is similar to *Brown & Williamson*, where a television reporter had a nightly feature known as "Perspective." *Brown & Williamson*, 827 F.2d at 1129. In giving his perspective, the reporter, Jacobson, moved to a different part of the newsroom. However, he was touted as the city's most savvy political reporter. The gist of Jacobson's perspective was that the plaintiff tobacco company was going after children to get them hooked on cigarettes. Jacobson relied on an FCC report regarding plaintiff's proposed advertising scheme. However, it was conceded that plaintiff never used this advertising scheme and the FCC report acknowledged that. The news broadcast did not report that the advertising scheme was never used by the plaintiff tobacco company.

In *Brown & Williamson*, the court held that this was not an editorial opinion protected by the first amendment, but that it was a factual report. Merely by sitting in a desk under a sign labeled "perspective" did not make the report an opinion. *See id.* at 1130. In *Brown & Williamson*, as in the instant case, plaintiff claimed that defendants intentionally and maliciously omitted significant facts from the report and distorted other facts. In *Brown & Williamson*, the court upheld the jury's verdict in finding defamation, and held that the perspective report was to be taken as a statement of fact and not protected as opinion. *Id.* at 1131.

At trial in the present case, respondents argued that the article was an accurate news story. Additionally, the reporter specifically stated that the article did not convey his opinion. Furthermore, the editors also testified that the article was an accurate investigative news story and not the opinion of the reporter or of the newspaper. Respondents and their employees stated that the only opinions in the article were the opinions of the quoted sources. Respondents have further argued that they have a qualified privilege for neutral reportage or fair comment. We agree with respondents' characterization of the article at trial, and hold that the article was intended as a statement of fact, and is not protected as an expression of opinion.

### DECISION

The trial court's decision granting the JNOV is reversed, and the jury's verdict is reinstated.

Reversed.