**Tom FOLEY, Appellant,**

v.

**WCCO TELEVISION, INC., et al., Respondents.**

**No. C0–89–1225.**

Court of Appeals of Minnesota.

Dec. 26, 1989.

Review Denied Feb. 9, 1990.

Patrick J. Foley, DeParcq, Hunegs, Stone, Koenig & Reid, P.A., Minneapolis, for appellant.

Paul R. Hannah, St. Paul, Paula D. Osborn, Oppenheimer, Wolff & Donnelly, Minneapolis, for respondents.

Heard, considered, and decided by GARDEBRING, P.J., and FORSBERG and RANDALL, JJ.

## OPINION

GARDEBRING, Judge.

Appellant Tom Foley commenced this defamation action against respondent WCCO–TV and its I–Team reporters contending that WCCO–TV aired broadcasts of a defamatory nature against Foley. The broadcasts concerned Foley's position as Ramsey County Attorney and the alleged failure of his office to properly investigate and resolve the manner of death of a Lauderdale, Minnesota woman.

Foley appeals the trial court's dismissal of numerous allegations for failure to state a claim upon which relief may be granted and entry of summary judgment against him on the remaining allegations. We affirm both the trial court's order dismissing the nonactionable allegations and the order granting summary judgment on the remaining allegations.

## FACTS

On July 21, 1982, a woman's naked body was found under water in the bathtub of her Lauderdale, Minnesota home. There was no evidence that she intended to take a bath nor that she intended to commit suicide. Furnishings in the woman's bedroom indicated possible signs of a struggle.

Initially the Roseville police department investigated the woman's death. The case was presented to the Ramsey County Attorney's Office but no charges were ever brought. At that time, Dr. Michael McGee, the medical examiner, listed the manner of death as "undetermined." However, by the fall of 1985, Dr. McGee was considering changing the manner of death designation on the death certificate to "homicide."

In early 1986, at the urging of a friend of the deceased, WCCO–TV began a review of the death, and its handling by the criminal justice system. The I–Team investigated the matter by reviewing police reports, interviewing officials involved in the case and close friends of the deceased. On February 27, 1986, the station aired the first of several broadcasts discussing the death and the law enforcement activities surrounding it. WCCO–TV admits the general tone of the broadcasts was critical of all public officials and agencies involved in the investigation, including Tom Foley and the Ramsey County Attorney's Office.

Foley commenced this action against WCCO–TV alleging that the I–Team initiated an investigation into Foley for the purpose of defaming him, and has acted deliberately and repeatedly with actual malice to him and with reckless disregard to the falsity of the matters asserted with respect to the investigation of this woman's death.

Foley alleged numerous statements having possible defamatory meaning. Upon the trial court's order, Foley filed a more definite pleading consisting of 197 statements alleged to be defamatory. The trial court separated Foley's allegations into four factual scenarios and analyzed them for defamatory content. The scenarios are: (1) that Foley requested the Attorney General's office to remove a state investigator from the case; (2) that Foley blocked the issuance of a search warrant to search the financial records of the deceased's husband, one of his campaign contributors and a suspect in the murder investigation; (3) that Foley was aware of an inherent conflict of interest involving himself and the deceased's husband; and (4) that Foley asked Medical Examiner Dr. Michael McGee not to change the designation on the death certificate from "undetermined" to "homicide."

The trial court dismissed the first three factual scenarios for failure to state a claim upon which relief may be granted and subsequently entered summary judgment against Foley on the fourth scenario.

## ISSUE

1. Did the trial court err in dismissing allegations for failure to state a claim upon which relief may be granted?

2. Did the trial court err in granting summary judgment?

## ANALYSIS

I. *Allegations Dismissed for Failure to State a Claim Upon Which Relief Can be Granted*

■ A plaintiff suing in defamation is required to plead and prove that the defendant published a statement of fact, that was false, that concerns the plaintiff, and that tends to harm the plaintiff's reputation and to lower him or her in the estimation of the community. *Lewis v. Equitable Life Assurance Society*, 389 N.W.2d 876, 886 (Minn.1986).

■ In reviewing cases dismissed for failure to state a claim on which relief can be granted, the appellate court determines whether the complaint sets forth a legally sufficient claim for relief.[1] *Elzie v. Commissioner of Public Safety*, 298 N.W.2d 29, 32 (Minn.1980).

■ Truth is a complete defense, and true statements, however disparaging, are not actionable. *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn. 1980). Opinions are also absolutely protected by the first amendment. *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1431 (8th Cir.1989).

Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is

---

1. In this case, the court determined that Foley failed to adequately specify the claimed defamatory language in the original complaint, and ordered Foley to submit a more detailed recitation of the alleged defamatory statements. Our review of the legal sufficiency of the claims is therefore based upon the statement entitled "Plaintiffs Allegations of Specific Words Establishing Defamation," as well as the complaint itself.

no constitutional value in false statements of fact.

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40, 94 S.Ct. 2997, 3006-07, 41 L.Ed.2d 789 (1974) (footnote omitted).

█ Whether a statement is one of opinion, hence absolutely protected by the first amendment, or one of fact, is a question of law for the trial court. *See Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1305 n. 7 (8th Cir.1986) (en banc), *cert. denied,* 479 U.S. 883, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986).

Furthermore, Foley's allegations must be considered

against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.

\* \* \* \* \* \*

Criticism of their official conduct does not lose its constitutional protection merely because it is effective criticism and hence diminishes their official reputations.

*New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 273, 84 S.Ct. 710, 721, 722, 11 L.Ed.2d 686 (1964).

The trial court considered the alleged defamatory statements contained in each factual scenario in light of what is legally required to state an actionable claim for defamation of a public official.

**A. Scenario 1: Removal of Investigator**

█ WCCO–TV reported that an investigator from the Minnesota Attorney General's Office began to assist the Roseville police in the investigation; that when Foley learned of the investigator's involvement, he called a deputy attorney general, who subsequently removed the investigator from the case because he did not want it to appear that Ramsey County was conducting the investigation inadequately; and that Foley denied requesting the removal of the investigator from the case.

█ The trial court determined that this was a factual account of the events as they occurred. Furthermore, the court stated that the questions raised by WCCO–TV concerning this scenario were editorial opinions and legitimate criticisms of public officials. We agree.

**B. Scenario 2: Search Warrant**

█ WCCO–TV reported that Foley's office blocked a search warrant to search the financial records of the deceased's husband. A subsequent report clarified that this meant Foley's office believed the police lacked probable cause to justify issuance; however, a warrant could have been obtained by appearing before a judge.

The trial court determined that the warrant was, in fact, denied and, viewing the statement in context, the subsequent explanation was sufficient to obliterate any possible inference that Foley sought to obstruct justice by opposing the search warrant. We concur.

**C. Scenario 3: Conflict of Interest**

█ In its I–Team broadcasts, WCCO–TV reported that the deceased's husband was a suspect in the case, and that he and 25 of his co-workers were contributors to Foley's re-election campaign and that some of the co-workers were members of Foley's campaign committee. This, WCCO–TV reported, created a conflict of interest. In October 1982, a letter was sent from the Roseville police department to the Ramsey County Attorney's Office suggesting the presence of a conflict of interest; however, it was not until three years later that the case was transferred to Anoka County to avoid the conflict. WCCO–TV questioned and criticized the delay in transferring the case to Anoka County.

The trial court determined that a conflict of interest clearly existed and that WCCO–TV's reporting of the matter was factually based and coupled with opinion and legitimate criticism of a public official and his office.

Even if Foley did not personally know of the letter or did not actively participate in the investigation until November 1985, the

Ramsey County Attorney's Office did have knowledge of the potential conflict of interest and was in charge of the investigation. A conflict of interest arises when a lawyer's representation may be materially limited by the lawyer's own interests. Minn. Rules of Professional Conduct 1.7. Conflicts of interest may be imputed to all lawyers associated with that firm. Minnesota Rules of Professional Conduct 1.10(a). From the facts, it appears that WCCO–TV had a reasonable basis upon which to conclude that a conflict of interest existed and to question the delay in transferring the case to Anoka County; therefore, we agree with the trial court's conclusion.

### D. Defamation by Innuendo

Appellant also argued before the trial court that many of the statements, even if true on their face, are defamatory by innuendo.

The trial court, relying on *Valento v. Ulrich*, 402 N.W.2d 809 (Minn.Ct.App. 1987), and *Hirman v. Rogers,* 257 N.W.2d 563 (Minn.1987), held that there can be no defamation of a public official by innuendo.

On appeal, appellant renews this argument, citing *Diesen v. Hessburg*, 437 N.W.2d 705 (Minn.Ct.App.1989), *pet. for rev. granted*, 442 N.W.2d 781 (Minn. May 12, 1989), a case handed down by this court since the trial court ruling.

However, the *Diesen* rationale is inapplicable on these facts. The *Diesen* holding turned, first, on the existence of known facts which, if reported, could have changed the defamatory implication of the article, and secondly, on the plaintiff's proof of actual malice by clear and convincing evidence.

In this case, Foley has not pleaded, nor does the record reveal, any additional material facts that the I–Team knowingly omitted which would have removed the allegedly defamatory tone of their broadcasts.

Further, the law is clear that in a defamation action brought by a public official, the constitutional guarantees of the first amendment preclude recovery absent a showing that the statement was made with "actual malice." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964). Actual malice has been defined as "knowledge that [the statement] was false or reckless disregard of whether it was false or not." *Id.* at 280, 84 S.Ct. at 726. Actual malice must be proven with convincing clarity. *Id.* at 285–86, 84 S.Ct. at 728–29.

Because the actual malice standard is the cornerstone of protection for free exchange of ideas about public officials, it may never be presumed or inferred by innuendo. *Hirman*, 257 N.W.2d at 566.

In the absence of either unreported facts which could have changed the implication of the broadcasts or clear and convincing evidence of actual malice, *Diesen* does not apply.

We have reviewed the dismissed statements in light of the above considerations and we agree with the trial court that the numerous allegations contained in these three factual scenarios consisted of truths, opinions, and criticisms of official conduct, and that further the theory of defamation by innuendo is not available on these facts; therefore, the trial court's dismissal of these allegations for failure to state a claim upon which relief may be granted is not erroneous as a matter of law.

### II. *Summary Judgment on the Basis of the Absence of Actual Malice*

The trial court determined that one fact scenario appeared to be capable of defamatory meaning, and therefore actionable. This set of statements became the subject of the later summary judgment motion. The factual setting of those alleged defamatory statements concern Medical Examiner Dr. Michael McGee and the cause of death designation on the deceased's death certificate.

Dr. Michael McGee performed the autopsy on the woman and marked on the death certificate that the manner of death was "undetermined." In 1985, three years after the autopsy, McGee decided he wanted to change the "undetermined" classification to "homicide." He contacted Roseville

police officer Lunzer and assistant Ramsey County attorney Charles Balck, who had been assigned by Foley to review this case.

On November 5, 1985, a meeting to review the matter was attended by Balck, McGee, Lunzer, and James Essling, an investigator for the medical examiner's office. Balck and Lunzer concluded that even if the manner of death was changed, there was insufficient evidence to obtain criminal charges. All four men agreed not to change the death certificate.

On February 27, 1986, Dr. McGee changed the death certificate to "homicide." That same day, Foley called a press conference and denied mishandling the case and informed the media that the case was being transferred to the Anoka County Attorney's Office to avoid any potential conflicts of interest. The case subsequently went to a grand jury. No indictment was issued.

WCCO–TV's report of the above incident included a quote from Dr. McGee:

[A]nd so we've tried to cooperate with them in that regard and have essentially done what they've asked us. * * * They've asked us at this time to hold the death certificate in the position it is now until they can explore any further examination they have to do.

The trial court did not strike the McGee allegations from Foley's complaint; however, it did grant summary judgment in favor of WCCO–TV upon finding no evidence indicating actual malice.

On appeal from a summary judgment the reviewing court determines whether there are any genuine issues of material fact and whether the trial court erred in its application of the law. *Hubred v. Control Data Corp.*, 442 N.W.2d 308, 310 (Minn.1989).

■ Because Foley holds the elected position of Ramsey County Attorney and performs governmental duties directly related to the public interest, he is a public official and, therefore, must prove actual malice before any defamation can be found. *Harte–Hanks Communications, Inc. v. Connaughton*, —— U.S. ——, ——, 109 S.Ct. 2678, 2685, 105 L.Ed.2d 562 (1989);

*Hirman v. Rogers*, 257 N.W.2d 563, 566 (Minn.1977). Actual malice requires proof that the statement was made with knowledge that it was false or with reckless disregard of whether it was false or not. *New York Times Co.*, 376 U.S. at 279–80, 84 S.Ct. at 725–26.

[R]eckless conduct is not measured by whether a reasonable prudent man would have published or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

*St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968).

■ On appeal from summary judgment in public figure defamation cases, the test is whether the evidence in the record could support a reasonable jury finding that the plaintiff has shown actual malice by clear and convincing evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

■ In considering WCCO–TV's motion for summary judgment, the trial court had considerable information before it. This information included the pleadings, discovery documents, motions and accompanying memoranda, scripts of the I–Team broadcasts, and tapes of a telephone conversation between the deceased's close friend and Investigator Essling indicating that Foley's office made the request. The record also included the press release issued by Foley on February 27, 1986, and affidavits of Foley, McGee, Balck, Essling and I–Team reporters Steve Eckert and John Lindsay.

Foley asserts that actual malice is demonstrated by WCCO–TV's repeated broadcasts that Foley's office requested McGee not to change the death certificate. Foley's picture accompanied this segment of the I–Team report. In particular, Foley contends that actual malice is shown by the I–Team's failure to ask McGee the ultimate

question, that is, whether Tom Foley personally asked McGee not to change the death certificate classification from "undetermined" to "homicide."

The affidavits reveal that Foley never personally asked McGee to change the death certificate; however, the affidavits and press release show that Foley asked assistant county attorney Balck to review the case file and that Balck advised McGee against changing the death certificate because it would not change the fact that there was insufficient evidence to charge any suspect.

Balck is an employee of Foley's office and was acting within the scope of his employment. Therefore, we believe that although Foley was not personally involved in the death certificate discussion, the acts of Balck may be attributable to him for this purpose. In addition, WCCO–TV specifically broadcasted McGee's press statement that the Ramsey County Attorney's Office never *instructed* him not to change the death certificate.

Upon independent review of the record, we find that WCCO–TV investigated this matter by reviewing public documents and interviewing the public officials and private citizens involved in this case. The record is devoid of evidence that WCCO–TV broadcasted its report knowing that the information was false or that WCCO–TV entertained serious doubts as to the truth of its publication; therefore, we conclude that summary judgment is proper in the absence of any issues of material facts relating to actual malice.

 While the dissent in this matter argues that summary judgment is a "blunt instrument," in public official defamation cases summary judgment is the preferred remedy because it prevents persons from being discouraged in the full and free exercise of their first amendment rights with respect to the conduct of their government. *See Washington Post Co. v. Keogh*, 365 F.2d 965, 967–68 (D.C.Cir.1966), *cert. denied*, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967). We believe its use and application here is appropriate.

## DECISION

Many of Foley's claims were dismissed properly for failure to state a claim upon which relief can be granted because they were not defamatory. Further, Foley failed to produce clear and convincing evidence that could support a reasonable jury finding that WCCO–TV's I–Team broadcasted its reports with actual malice. We reviewed the remainder of Foley's claims on appeal and find them to be without merit under the facts of this case.

Affirmed.

RANDALL, Judge, dissenting.

I respectfully dissent. I do not find this complicated case at this time, on this record, appropriate for disposition by a Rule 12 motion for judgment on the pleadings and/or summary judgment.

The voluminous record contains numerous disputed fact issues and allegations by appellant that key facts were known, but omitted or slanted. Appellant argues vigorously that a jury is entitled to see the entire picture, and that if they resolve certain inferences in his favor actual malice could be found. There are several key areas in dispute. What did appellant actually know; what did appellant actually do; and what did respondents really know about what appellant did or did not do, as opposed to what they actually published.

Relative to appellant's allegations that were dismissed on respondents' motion for summary judgment, the record discloses disputed fact issues concerning who, if anyone, from appellant's office put pressure on Dr. McGee not to change a death certificate from undetermined to homicide. Did appellant do it? Did appellant authorize someone else to do it? Was it "pressure" or just a common sense decision not to make a hurried change just because of publicity? Did respondents know that appellant never personally talked to Dr. McGee? Did respondents know this but continue to intentionally imply that the pressure or suggestion not to change the death certificate came from appellant himself?

On the issues disposed of by granting respondents' motion for judgment on the pleadings, I find it difficult to hold, as a matter of law, that appellant could not produce facts which, if proven, could lead a reasonable jury to find defamation. On the issue of whether appellant contacted the attorney general's office to remove an investigator from the case, there is a dispute over whether the investigator was actually "removed" and a dispute as to whether appellant deliberately requested a "removal," if one occurred.

Relative to the search warrant, did appellant "block" it in the pejorative sense or was the decision made based on reasonable judgment by a prosecuting attorney that probable cause for a search warrant could not be found. Did respondents subsequent "clarification" remove all taint or did the implication linger that appellant deliberately hindered an ongoing investigation? On the issue of the suspect's political contributions, were the amounts so insignificant and their timing such that respondents, with years of experience covering local, state, and national elections, knew that the minimal amount in question could not influence a homicide investigation. If they knew that, did they intentionally broadcast a partial story to imply otherwise? I am not in a position to weigh the merits of appellant's ultimate case to a jury. However, I can say with reasonable conviction that if all factual disputes and all questions are answered by a jury in appellant's favor, the high threshold a public official needs to meet to prove actual malice could be satisfied.

Appellant makes out a reasonable case that at every juncture, the broadcasts put him in as bad a light as possible. Did respondents actually know facts which would have dramatically changed the slant they were putting on the story? If they knew, then, did they intentionally withhold them with "reckless disregard for truth or falsity?"

The majority correctly points out that a public official has a heavy burden of proof in a defamation case.

Actual malice requires proof that the statement was made with knowledge that it was false or with reckless disregard of whether it was false or not. *New York Times Co. v. Sullivan,* 376 U.S. 254, 279, 84 S.Ct. [710] at 726 [11 L.Ed.2d 686] (1964).

> Reckless conduct is not measured by whether a reasonable prudent person would have published or would have investigated before publishing; rather, there must be sufficient evidence to conclude that the defendant in fact entertained serious doubts as to the truth of its publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

*St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968).

However, I find that this burden of actual malice can be met short of proof that there were out and out deliberate lies. In a case presently before the Minnesota Supreme Court, *Diesen v. Hessburg,* 437 N.W.2d 705 (Minn.Ct.App.1989), this court, relying on a Tennessee Supreme Court case, *Memphis Publishing Co. v. Nichols,* 569 S.W.2d 412 (Tenn.1978), found that statements, even if true taken in their literal context could amount to defamation. In *Diesen* we said:

> In *Nichols,* a private citizen was allegedly defamed by the implication that she was having an adulterous affair with a neighbor's husband. If all the facts had been printed by the paper, this defamatory and false implication would not have been created. The court in *Nichols* stated that the defendant's reliance on the truth of the facts was misplaced because the question was "whether libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id.* at 420 (quoting *Fleckenstein v. Friedman,* 266 N.Y. 19, 23, 193 N.E. 537, 538 (1937)). The publication of the complete facts could have conceivably led the reader to conclude that there was no adulterous relationship.
>
> The published statement, therefore, so distorted the truth as to make the en-

tire article false and defamatory. It is no defense whatever that individual statements within the article were literally true. Truth is available as an absolute defense only when the defamatory meaning conveyed by the words is true.

*Id.*

We agree with the holding in *Nichols*. There may be defamation by implication, where known facts are omitted, which could have changed the defamatory implication of the article. It is clear that this is a half-truth, which amounts to merely a lie.

*Diesen,* 437 N.W.2d at 709.

Respondents argue vigorously that in all respects truth is a complete defense. However, I find that the defense of "truth" is not confined to an examination of just the five alphabetical components of the word.[1]

Here, appellant may be able to prove a case of defamation by implication discovered in *Diesen.* The thrust of respondents' broadcasts was that appellant, a prominent elected official, had intentionally stonewalled and interfered with a homicide investigation because a suspect was a political contributor. The content and slant of the broadcasts permit no other inference. This inference was intentionally and deliberately created by respondents. The allegations are extremely serious. They are in a proper area, governmental activity, for the media to scrutinize, but the media's privileges are not unbounded. The first amendment is a high and mighty wall, but does not stretch to infinity.

When hearing motions for failure to state a claim upon which relief can be granted or summary judgment, courts are not asked to weigh evidence, determine credibility, resolve factual disputes, and decide the merits of a plaintiff's case. Instead, a court's duty is simply to determine if a claim could ever lie, and as to summary judgment, our duty is simply to determine whether genuine issues of material fact exist, *"not how such issues should be resolved."* *Vacura v. Haar's Equipment, Inc.,* 364 N.W.2d 387, 391 (Minn.1985) (emphasis added). To make this determination, the evidence must be viewed in the light most favorable to the non-moving party, and "all doubts and factual inferences must be resolved against the moving party." *Nord v. Herreid,* 305 N.W.2d 337, 339 (Minn.1981). Summary judgment "is not intended as a substitute for trial * * *." *Vacura,* 364 N.W.2d at 391 (citation omitted). Because summary judgment is a "blunt instrument," its use should be limited to cases in which "it is perfectly clear that no issue of fact is involved." *Donnay v. Boulware,* 275 Minn. 37, 45, 144 N.W.2d 711, 716 (1966). This is not such a clear case; consequently, disposition by summary judgment is inappropriate, as is disposition by dismissal for failure to state a claim on which relief could be granted.

Appellant's status as a public figure[2] prevents him from receiving any damages absent proof of actual malice, *New York Times,* 376 U.S. at 279, 84 S.Ct. at 725, but I suggest at this stage enough of a case

---

1. The following story is likely apocryphal but serves to illustrate the point. Supposedly years ago in a small southern town, the editor of the local newspaper chose up sides against the mayor running for re-election and threw his newspaper support behind the challenger. On the evening before election day, the editor bannered the headline "Mayoral Incumbent Caught Eating a Dead Female Thigh." The predictable happened. The next day the town had a new mayor and the defeated incumbent, not being at all convinced of his participation in such a dastardly deed, hired a law firm to investigate and bring suit. Upon completion of the investigation, it came out that at a Sunday church social one month before the election the mayor, his wife, his two children, and his grandparents were in attendance where the main course was roast turkey with all the trimmings. The newspaper editor, sitting at an adjoining table, observed the mayor holding a napkin in front of his face (because his socially conscious mother disapproved of adults eating in public with their fingers) while avidly chomping on a hen turkey drumstick. At trial, when the "fowl" facts came to light, over the editor's protestations that every word in the headline was defendable, the judge did find that a suit did lie.

2. Generally, false allegations which attack a person's professional conduct are defamatory per se. *Becker v. Alloy Hardfacing & Engineering Co.,* 401 N.W.2d 655, 661 (Minn.1987); *Lee v. Metropolitan Airport Commission,* 428 N.W.2d 815, 819 (Minn.Ct.App.1988).

exists to present to a jury. Although the *New York Times* standard of actual malice is high, we need to avoid getting hung up on the term "actual malice." In reality, media people (unless they are looking for another job and want to draw unemployment compensation during the search) do not come right out and start a story by stating, "I have malice against you and intend to publish deliberate falsehoods." Rather, defamation is concocted out of truth taken out of context, omitted facts, unbalanced reporting, and slants designed to do injury. Generally, in all civil cases the plaintiff's burden of proof is rarely made easy by frank admissions by a defendant to all the essential elements that a plaintiff needs to make a case. The purpose for factfinders is often to sift through half truths and distortions. Plaintiff is entitled to build a case, carefully laid evidentiary block upon block, and strive to convince a jury that the implications and inferences he wants drawn were so intended by defendant.

I do not find the broad shield of the first amendment impervious to appellant's attack at this pretrial stage. Ultimately at trial, respondents could prevail but sufficiency of the evidence is not now the issue on appeal. Based on this record, I believe that if a jury resolved all factual disputes in appellant's favor, and resolved all inferences for appellant and against respondents, it could find actual malice.

The trial court did a conscientious job on setting up and analyzing the issues. But I cannot escape the feeling that the trial court, in effect, conducted a "mini trial" on the issues, weighed evidence and credibility, and came to the conclusion that appellant probably would not prevail at trial. Summary judgment is not the proper forum to resolve disputed issues, but rather to see if genuine issues of material fact exist. *See Hinrichs v. Farmers Cooperative Grain & Seed Association,* 333 N.W.2d 639, 641 (Minn.1983).

If this case proceeds to trial, the trial court still has three stages at which it can exercise discretion to prevent an unjust result. The trial court can direct a verdict for defendant at the close of plaintiff's case or at the close of all the evidence, but before the case goes to the jury. Additionally, the trial court can grant a judgment notwithstanding the verdict if the case goes all the way to a jury verdict, but the court feels a manifest injustice has been done. Each of these dispositions, although as drastic as summary judgment, display an inherent fairness to a plaintiff that summary judgment and pretrial dismissals do not, as these three alternatives at least allow the plaintiff to present a case. If, upon the conclusion of plaintiff's presentation, the trial court decides that the plaintiff cannot prevail, as a matter of law, and dismisses, the plaintiff had a day in court. Summary judgment and dismissal on the pleadings have a legitimate place in the legal system, but should not be a substitute for trial and were never meant to be a calendar control device in jurisdictions with high case loads.

In conclusion, I would find that appellant has at least presented claims upon which relief could be granted. As to the propriety of summary judgment, I find unresolved material and substantial fact questions. I would order the parties to complete pretrial discovery, and proceed to trial on the merits.